D.S., APPELLANT, V. UNITED CATHOLIC SOCIAL SERVICES OF THE ARCHDIOCESE OF OMAHA, INC., ET AL., APPELLEES.
419 N.W.2d 531

Filed February 19, 1988.   No. 87-469.

Warren S. Zweiback of Zweiback, Flaherty, Betterman & Lamberty, P.C., for appellant.

Jeanne A. Weaver of Hotz, Kizer & Wintz, P.C., and John H. Kellogg, Jr., for appellees United Catholic Social Services et al.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

PER CURIAM.

The plaintiff is a 21-year-old unmarried woman. On August 8, 1986, she gave birth to a son. On August 18, she executed a relinquishment in favor of the United Catholic Social Services of the Archdiocese of Omaha, Inc. (UCSS). The acceptance of the relinquishment was executed the same day and the baby placed for adoption on the following day.

On December 16, 1986, the plaintiff commenced this action for a writ of habeas corpus on the theory that her relinquishment was invalid. The second amended petition, filed April 10, 1987, alleged that the relinquishment was involuntarily given in the presence of threats, coercion, fraud,

and duress, and that a written acceptance was never delivered to the plaintiff.

At the close of the plaintiff's evidence, the defendants moved to dismiss the petition. The trial court found that the relinquishment had been freely and voluntarily signed by the plaintiff; that it had not been obtained by threats, force, or coercion; and that the motion to dismiss should be sustained. The plaintiff has appealed.

The plaintiff's principal assignment of error is that the trial court erred in failing to find that the relinquishment was invalid because it was involuntarily given.

A decision in a habeas corpus case involving the custody of a child is reviewed by this court de novo on the record. Where the evidence is in irreconcilable conflict, we consider the findings of the trial court. *Gaughan v. Gilliam*, 224 Neb. 836, 401 N.W.2d 687 (1987), citing *Auman v. Toomey*, 220 Neb. 70, 368 N.W.2d 459 (1985).

When a trial court sustains a motion to dismiss at the close of a plaintiff's case in chief, the Supreme Court must treat as admitted the truth of all relevant evidence favorable to the plaintiff and must give the plaintiff the benefit of all permissible inferences deducible from the properly admitted evidence to determine whether a prima facie case has been established. See, *First Nat. Bank & Trust Co. v. Hughes*, 214 Neb. 42, 332 N.W.2d 674 (1983); *Gordman Properties Co. v. Board of Equal.*, 225 Neb. 169, 403 N.W.2d 366 (1987). Thus, we review the record to determine whether the evidence, when viewed in the light most favorable to the plaintiff, was not sufficient as a matter of law to sustain a finding that the relinquishment was invalid.

The record shows that the plaintiff was a student at Creighton University on January 15, 1986, when she learned that she was pregnant. On the next day she notified the father, who was a married man with one child. They discussed the possibility of an abortion, and he sent the plaintiff some money to pay for an abortion.

The plaintiff's mother and father lived on a farm near a small town in Iowa. She did not tell her parents that she was pregnant until some days later, when her sister had a medical

appointment in Omaha. By that time she had consulted several doctors, had decided against having an abortion, and had completed plans to transfer to Gonzaga University at Spokane, Washington. The purpose of transferring to Gonzaga was so that students from her home town attending school at Creighton would not learn of her pregnancy.

When the plaintiff told her sister that she was pregnant, her sister shook her head and said, "Oh, my God." The sister, together with her mother, immediately began asking the plaintiff, "What are your plans? What are you going to do now?" The plaintiff told her sister and mother that she had made plans to leave for Gonzaga University and stated, "I have to go; I have to leave." The plaintiff told her sister that she planned to place the baby for adoption. In describing her mother's reaction, the plaintiff stated that "[s]he acted very disgusted with me and she asked me how I could do that and she asked me what I planned to do, how I planned to leave Creighton, how I could screw up my education and stuff like that. . . ."

The following day, the plaintiff left for Gonzaga, where she stayed until May, except for a brief return to Iowa over the spring break in March.

According to the child's father, he maintained contact with the plaintiff while she was at Gonzaga, and the two of them spoke on the telephone about every 10 days. He also stated that the plaintiff asked him for his opinion as to what she should do, "[m]any times." He said that he told the plaintiff that she had to "make up her own mind." He at no time made any physical threats to the plaintiff in regard to the adoption.

During the next few months, the plaintiff told various individuals that she planned to place the baby for adoption. Prior to the break in March, she apparently had conversations with her mother and sister about returning to Iowa for the break. She stated that she wished to spend the break at home but her mother would not allow it because people there would see her and learn of her pregnancy. Together, her mother and sister agreed that if she flew from Spokane to Sioux Falls instead of Omaha, no one would see her and learn of her condition. Her sister agreed to let the plaintiff stay with her and

her family in Spirit Lake, Iowa, if the plaintiff would not "go anywhere" or "do anything," including going home. The sister stated that the reason for "hiding" the plaintiff was so others would not see her and because "[w]e didn't want anybody to know." By "we" she meant the family, and at that time thought the plaintiff felt that way, too. The sister stated that she restricted the plaintiff's activities because "I thought nobody was going to know about this. I think we were trying to protect [the plaintiff] as well as protect ourselves." The plaintiff was not bound or tied in the sister's home over the break, nor were the doors locked when the sister left for work. The sister ultimately stated that everyone, including the plaintiff, was involved in the decision that the plaintiff restrict her "public" activities.

The plaintiff spent the spring break at her sister's house. Her parents visited her there during her stay. During this time the plaintiff told her parents that she was unsure of what she wanted to do with the baby and, for the first time, said that she was considering the idea of keeping the baby herself. In response, her mother said that "the child needs two parents and that these people really wanted this baby and that they would really love the baby." During this time, the plaintiff recalled, her mother told her that she was not a good person and that she had sinned and could probably never become a good person, and that if she kept the baby she would be ruining their life, the baby's life, and everyone's life.

The sister became aware of the plaintiff's ambivalence in placing the child for adoption and stated that she told the plaintiff "I didn't know how she could do that to mom and dad." The sister denied *arguing* with the plaintiff about the matter and characterized their encounters as *discussions*, in which she would tell the plaintiff that she thought it better for the plaintiff not to keep the baby. The sister denied telling the plaintiff anything about what others might think if they were to see her pregnant. According to the plaintiff, the conversations with her sister during the break focused on the humiliation and embarrassment that would inure to the plaintiff and the parents if she decided to keep the baby. The sister admitted taking a side in the debate and urging adoption as the proper choice for the

plaintiff as well as for the sister and the parents, so that no one would be embarrassed. The sister further told the plaintiff that welfare would be an awful choice, that the plaintiff could not go to school and have a baby, and that the plaintiff needed to give the baby two parents.

In addition to speaking with her parents and sister over the break, the plaintiff also spoke with the father of the child, who told her not to keep the child because it would ruin his life once his parents found out. Additionally, he feared losing custody of his son. The plaintiff also visited with an attorney who was a family friend, and who resided in the same town as the sister. At this time, according to the attorney, the plaintiff related that her parents would accept her if she relinquished the child. The plaintiff also stated that it was her perception that if she did not relinquish, her parents would disown her, and she would not be welcome in their home. At this time, the plaintiff considered the attorney as an individual who did not take a side, but who was someone she could talk to about a variety of things relating to the pregnancy and impending birth.

At the end of the break, the plaintiff returned to Gonzaga, and throughout the remainder of the semester counseled with a priest and a counselor. At the end of the semester, the plaintiff wanted to return home, but stated that her mother wrote her a "nasty" letter stating that she was an "embarrassment," a "disappointment," and a "disgrace," as well as irresponsible. Her mother again refused to permit the plaintiff to return home. After many family discussions and apparently tense moments, the plaintiff decided to return to her sister's home.

On May 15, 1986, the plaintiff visited with Beverly Macek, a children's services counselor for UCSS in Omaha, about the possibility of adoption. She told Macek that her parents and sister were supporting a decision for relinquishment and out-of-state placement. Apparently, the plaintiff told Macek that she feared her family would disown her if she were to raise the child herself.

The plaintiff stayed at her sister's home from May 15 until mid-June. During this time, they engaged in conversations relating to her plans for her baby. During this time, the plaintiff was confined to the house, and at times when guests were

visiting, she went to her room in the basement.

Around June 20, the plaintiff left her sister's home because of the situation's stressful nature. Both her sister and her sister-in-law were pregnant at this time, and it was difficult for the plaintiff to have to hide her own pregnancy.

At this time the plaintiff moved to the home of the attorney and her husband, where she lived until just days before the baby was born. Although not restricted to the attorney's home as she had been at her sister's, the attorney did not recall the plaintiff's going out to the grocery store or out in public generally, except for the times she would join them for a ride in their boat.

The plaintiff continued to have contact with her parents about every other week, and, according to the plaintiff, her mother continued to pursue the plaintiff's plans, stating, "If [you] planned to keep the baby, why did [you] leave in January? This is a big embarrassment to us, the whole family. What did we do wrong in raising you?" The plaintiff stated that she would ask her mother what she would do if she kept the baby and her mother would not specifically answer, but stated, "Everything will be fine as long as you come home empty-handed." Her mother also told her that if she were to keep the baby, her parents would not follow through on their original intentions of helping her repay her school loans.

The mother would not respond when asked if the plaintiff could retain the family car. The record does reflect that the mother sent the plaintiff various prayer cards, as well as letters, over the course of the pregnancy, all of which appear to be supportive in nature.

The plaintiff continued to talk with her sister during this period, and, according to the plaintiff, her sister did not understand how she could be putting her parents through this ordeal and thought that it would be best for everyone if she placed the baby for adoption. During conversations with the baby's father, he, too, said that adoption was the only option available to her and that he could not help her further financially.

While she was residing with the attorney, the attorney and the plaintiff quite frequently discussed the options available: a paternity suit, child support, ADC, child-care and day-care

centers, and remaining in college while raising a child. At no time prior to the baby's birth did the attorney take a position as to whether the plaintiff should retain or relinquish the baby. The attorney stated that the plaintiff continued to be indecisive and unsure of what her decision would be.

Throughout June and July the plaintiff continued to meet with Macek of UCSS about every 2 weeks, continually expressing fear and indecision. During one of these sessions, the plaintiff expressed her desire to have an out-of-state adoption so that she would not run the risk of meeting with her baby. However, the plaintiff testified that she changed her mind during the course of her counseling. The plaintiff stated that "[Macek] told me that if I placed the baby in-state through their agency they would have more control over the families, whereas, if I placed the baby out of state, they wouldn't and that I would just have to trust her." Additionally, she stated that Macek told her that if she were to choose in-state placement, she would receive pictures and a letter quarterly for the first year and annual pictures and letters thereafter, until the child reached age 25. The plaintiff stated that Macek told her that she would be able to meet her child at that time if she so chose. The plaintiff also recalled, however, that Macek told her early in the course of their meetings that "I cannot guarantee delivery of pictures and letters."

In the final week of her pregnancy, the plaintiff stated, discussions of her options escalated. The child was born on August 8, 1986. The plaintiff's mother and the attorney were present with her in the delivery room. Her mother did hold the newborn infant in the delivery room, after having him handed to her by the attorney. According to the plaintiff, her mother did not cuddle the baby, but upon seeing the infant said, "He is not a [family name]" and "that baby needs a father."

It was not until after the child's birth that Macek, the counselor at UCSS, learned that the child's father was a married man. It was also after the baby's birth that the attorney first took a stance and voiced an opinion as to what she believed the plaintiff should do with the baby. The attorney admitted telling the plaintiff that "she needed to do what was in [the child's] best interest," meaning, relinquish the child. She further stated that

the reason for her urging was "mainly it was in her relationship with her family. Up until that last week I wasn't convinced that her parents would in fact disown her or that [her sister] would but I became convinced of that after [the child's] birth." This concern was communicated to the plaintiff as the basis for the attorney's concern.

The plaintiff was dismissed from the hospital with the baby on the Sunday following the baby's birth, and remained in Omaha until Wednesday. Her mother would visit occasionally but would not look at the baby, according to the plaintiff. Similarly, her sister also visited the plaintiff and the baby but would not look at or touch the baby. The sister testified that she did not express love toward the baby, and essentially rejected the infant. Both the mother and sister continued to encourage the plaintiff to sign the adoption papers, as did the father, who told the plaintiff that she "needed to get the baby out of [her] life and get it into a stable home." The plaintiff testified that the father told her that if she kept the baby and named him as father, he would fight for custody of the child.

During the week following her delivery, the plaintiff said that she wanted to keep the baby, but everyone was upset with her because she was getting too attached. The mother called her every evening during this week and asked if she had made her decision.

During this week the plaintiff took the baby to a physician, who, according to the plaintiff, told her that a child needs two parents and ultimately recommended adoption to her.

On Wednesday, August 13, the child was placed in foster care with UCSS. The plaintiff spent that evening and night with the attorney. The next day, Thursday, the plaintiff took the child out of foster care and returned with him to the attorney's home, where she stayed until Friday evening. On August 15, the father signed a relinquishment at the attorney's office in Iowa. On Saturday, August 16, the plaintiff returned to Omaha with the attorney and the child and proceeded to UCSS to speak with Macek. After about an hour at UCSS, Macek took the baby to a foster care home, and then Macek, the attorney, and the plaintiff set out for Council Bluffs, where the relinquishment was to be be signed. (The relinquishment was to be signed in

Iowa because the attorney was to be the notary and she was an Iowa resident.) Due to a mixup relating to the location where the parties were to meet, the attorney and the plaintiff spent about an hour waiting for Macek to arrive. During this time, the plaintiff stated, she cried a lot, and also stated that she told the attorney, "I didn't know if I could do it. I didn't know if it was the right thing." The plaintiff related that when Macek arrived the plaintiff informed Macek that she had decided not to sign the papers. Macek testified, however, that due to the mixup in location and the fact that the papers would have to be signed on the hood of the car (because the church where they were to sign was closed), she felt it best to postpone the signing until Monday. The attorney and the plaintiff then returned to Omaha. The plaintiff continued to be emotionally upset, but the attorney testified that she did not think the plaintiff needed sedation or other medication.

On Monday, the 18th, the plaintiff drove herself to UCSS. While there, she saw the child, fed him, changed his pants, and took pictures of him. After many tears and apparent agonizing, the plaintiff signed the relinquishment in front of Macek, who signed as a witness, and a notary public who took her acknowledgment. Despite the plaintiff's crying, Macek testified, she felt the plaintiff was in control. The acceptance portion of the relinquishment was not signed at the time the plaintiff signed, nor in her presence, but was signed later that day by a representative of UCSS.

Immediately after signing the relinquishment, the plaintiff did not ask Macek to destroy the relinquishment or to return her son to her. The plaintiff was not under the influence of alcohol or drugs on the date of the signing. According to Macek, the baby was placed with adoptive parents the following day, persons whom the plaintiff had participated in selecting. The plaintiff left UCSS and returned to the attorney's home in Iowa. According to the attorney, the plaintiff did not actually remember signing the papers and "kept saying that she still didn't know whether she had done the right thing."

The plaintiff continued to counsel at UCSS, but at no time expressed an intention to revoke her relinquishment. On October 10, the plaintiff met the adoptive parents. During that

visit, they informed the plaintiff that they would only provide her with pictures for 2 years, which was different than the plaintiff had anticipated pursuant to her prior conversations with Macek. The plaintiff spoke with the father following her relinquishment and on several occasions spoke about revoking the relinquishment.

The plaintiff testified that she was persuaded by statements made by her mother, father, sister, the child's father, and the attorney in making her decision to sign the relinquishment. Because of their viewpoints, the plaintiff felt that she had to sign the papers, but it was not her desire to sign at the time that she did. The plaintiff admitted that throughout the course of her counseling at UCSS, she was never forced to sign any paper requiring her to promise to relinquish her child, nor did she pay a fee for the counseling services. She admitted that she and Macek discussed keeping her baby and placing her baby for adoption. In the same vein, Macek testified that in the course of her counseling at UCSS she has worked with women who have relinquished and those who have not relinquished, and that the ultimate decision is of no consequence to her *personally*. She does not receive a bonus for placing babies for adoption and is not subject to a quota system.

Despite the evidence of tense, emotional moments during the course of her pregnancy, the plaintiff stated that she believed that her parents loved her in the summer of 1986 and that she, too, loved her parents. On cross-examination, the plaintiff admitted that her mother never specifically told her "We will disown you if you keep this baby." In fact, she stated that no family member, including a brother who left the Catholic Church, had ever been disowned. The sister testified that she had great affection for the plaintiff and that her motivation for urging adoption was that she thought she was helping. The sister gave her opinions to the plaintiff because as sisters the two women had always valued each other's opinions. The sister denied threatening the plaintiff in any way regarding a decision to keep the child, although she felt she could have been more supportive of the plaintiff, and stated, "I never gave her the impression that I would be supportive of her keeping [the child]," and that she, in fact, gave the opposite impression.

The evidence in this case, which has been summarized above, when viewed in the light most favorable to the plaintiff, was as a matter of law not sufficient to show that the relinquishment was involuntary or that it was the result of threats, coercion, fraud, or duress. No one forced the plaintiff to make the decision she made. The plaintiff was faced with a very difficult decision. There were many disadvantages to either decision she could make. It was unfortunate that the father was married and suffering financial difficulties. We find, as a matter of law, that the relinquishment was voluntarily given and was not subject to revocation by the plaintiff.

The second assignment of error alleges that the relinquishment was conditioned upon the retention of some parental rights. The record does not support this contention. The plaintiff hoped that she would be able to receive letters and photographs of her son until he became 25 years of age. Although there was some mention of the possibility, there was no promise or guarantee that she would receive such letters or photographs. The assignment is without merit.

The third assignment of error is based on a theory that a relinquishment is not valid until the parent receives a signed copy of the acceptance by the agency. The statute makes no such requirement.

Neb. Rev. Stat. § 43-106.01 (Reissue 1984) provides the following requirements for a valid relinquishment:

> When a child shall have been relinquished by written instrument, as provided by sections 43-104 and 43-106 . . . to a licensed child placement agency and the agency has, in writing, accepted full responsibility for the child, the person so relinquishing shall be relieved of all parental duties toward and all responsibilities for such child and have no rights over such child.

The statute requires both a written relinquishment and a written acceptance, both of which were properly done in this case. The appellant signed the relinquishment on August 18, and, in turn, UCSS signed the acceptance on that same day. There is no language requiring adoption agencies such as UCSS to send notice of the acceptance to the relinquishing parent.

The relinquishment was complete and effective when UCSS

signed the acceptance, and there was no necessity to send a copy of the signed acceptance to the plaintiff.

The final assignment of error concerns the trial court's refusal to permit the plaintiff's counsel to inspect a confidential file kept by UCSS relating to the adoptive parents. The trial court examined the file *in camera*, found that it contained no evidence relevant to any issue in this case, and ordered it sealed and placed in the record. We have examined the file and find it contains nothing relevant to any issue in this case.

A court may make any order which justice requires to protect a person from annoyance, embarrassment, oppression, or undue burden or expense, including limitations on the method of discovery. Neb. Ct. R. of Disc. 26(c) (rev. 1986).

Control of discovery is a matter for judicial discretion. *Bump v. Firemens Ins. Co.*, 221 Neb. 678, 380 N.W.2d 268 (1986). The burden of showing an abuse of discretion is upon the individual asserting it. *Von Seggern v. Kassmeier Implement*, 195 Neb. 791, 240 N.W.2d 842 (1976). A judicial abuse of discretion requires that the ruling of a judge be shown to be clearly untenable, depriving the litigant of a substantial right and denying a just result in the matter submitted for disposition. *Newton v. Brown*, 222 Neb. 605, 386 N.W.2d 424 (1986). No such showing was made. The ruling of the trial court was correct, and it is affirmed.

The judgment is affirmed.

AFFIRMED.