IN RE INTEREST OF C. W., M. W., K. W., AND J. W., CHILDREN UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE AND CROSS-APPELLANT, V. D. W., APPELLANT AND CROSS-APPELLEE, ROSEBUD SIOUX TRIBE, APPELLEE AND CROSS-APPELLEE.

479 N.W.2d 105

Filed January 17, 1992.   No. 90-157.

818

Sandra Hernandez Frantz for appellant.

Gary E. Lacey, Lancaster County Attorney, and Alicia B. Henderson for appellee State.

Kevin Ruser for appellee Rosebud Sioux Tribe.

Susan Jacobs, guardian ad litem.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

WHITE, J.

A series of petitions alleged separately that each of the four children involved in this case lacked proper parental care by reason of the fault and habits of their mother, D.W., appellant. All four of the children had been born out of wedlock and had been under the jurisdiction of the juvenile court for years prior to the commencement of the termination proceeding that is the subject of this action.

The Rosebud Sioux Tribe was notified of the first petition, of which M.W. was the subject, by registered mail, return receipt requested. The tribe received notice 20 days before adjudication, but informed the Lancaster County Attorney in writing over 1 month after M.W.'s adjudication as a neglected child that the Rosebud Sioux Tribe would not accept jurisdiction of the case, citing noneligibility of both the mother and M.W. for enrollment. The Rosebud Sioux Tribe suggested that the mother and M.W. might possibly be members of the Oglala Sioux Tribe and subsequently notified by letter the Oglala Sioux Tribe, informing it of the proceedings regarding M.W.

A second petition was filed in juvenile court, this one

concerning C.W., and a copy thereof was sent to the Rosebud Sioux Tribe. The Rosebud Sioux Tribe again declined to intervene, but later posited that the mother *was* eligible and should she decide to enroll herself in the tribe, then the tribe should be sent notice.

The Oglala Sioux Tribe filed its notice of intervention and petition for transfer for both M.W. and C.W. The juvenile court transferred the case; however, upon appellant's objection to the transfer, the transfer was set aside, and C.W. was also adjudicated as a neglected child.

Later, a third petition was filed in the interest of K.W., and in light of the previous responses from the Rosebud Sioux Tribe indicating its position on the matter, notice was sent only to the Oglala Sioux Tribe.

Two weeks after K.W.'s adjudication as neglected, the juvenile court was informed that the Oglala Sioux Tribe would decline to intervene in the case because the mother was not on the official records as the daughter of a member of the tribe and was therefore not eligible for enrollment in the Oglala Sioux Tribe.

The mother's fourth child was the subject of the fourth petition to be filed, which took place in Adams County Court, as J.W. had been born in an Adams County hospital. J.W. was adjudicated a neglected child and her case was transferred to Lancaster County for disposition. After each adjudication concerning the four children, dispositional and review hearings were held on a regular basis.

A supplemental petition requested termination of the mother's parental rights on the grounds of abandonment, neglect, and her habitual use of intoxicating liquor and narcotics. No personal service of the supplemental petition was made on the mother and ineffective service was made on the Oglala Sioux and Rosebud Sioux Tribes.

Additionally, the appellant was given a substantial quantity of discovery material 7 days before trial, and another stack of discovery material at 7 p.m. the evening before trial, alleged by the mother in her brief to have been purposed to set the appellant at a tactical disadvantage.

The case was dismissed due to the insufficient notice to the

tribe, but the State refiled, sending proper notice to the tribe. Shortly before trial the Rosebud Sioux Tribe filed a petition for transfer of jurisdiction to the tribal court, which the court sustained. Three days later the State filed its motion for new trial and vacation of the juvenile court's order of transfer of jurisdiction, which was ultimately sustained. That same day the Rosebud Sioux Tribe filed an order accepting the transfer of jurisdiction.

The trial on the termination of parental rights proceeded. The court terminated the mother's parental rights, stating that she was unfit by reason of abuse of intoxicating liquor and drugs, and that reasonable efforts to correct the problems had failed. The court further terminated the parental rights of the respective putative fathers of the children and ordered that the matter be transferred to the Rosebud Sioux Tribe for the dispositional phase of the proceeding. The juvenile court stayed transfer of the children pending appeal.

Appellant alleges what we have summarized as 11 assignments of error, in which she claims that the juvenile court erred in that it (1) terminated her parental rights in violation of the Indian Child Welfare Act of 1978, 25 U.S.C. §§ 1901 et seq. (1988) (hereinafter the ICWA); (2) obtained jurisdiction of the matter in violation of the ICWA; (3) took judicial notice of a juvenile court file which contained evidence admitted in violation of the ICWA and took judicial notice of such file in violation of appellant's rights to confrontation and cross-examination; (4) terminated her parental rights when the petitioner had not provided qualified experts to testify, as required under the ICWA; (5) abused its discretion by refusing to transfer the case to the Rosebud Sioux Tribal Court; (6) exercised jurisdiction when it no longer had jurisdiction, as the Rosebud Sioux Tribal Court had accepted jurisdiction; (7) terminated appellant's parental rights when petitioner had not met its burden of proof beyond a reasonable doubt, nor had petitioner shown that appellant had caused any direct harm to the minor children; (8) considered the guardian ad litem's recommendations and evidence when the guardian ad litem had not adhered to the principles of the ICWA nor her statutory duties as guardian ad litem; (9) admitted into evidence

information from tribal files, social worker files, and attorney files as business records; (10) used violations of the ICWA as to placement of Indian children and the consequences of said placement against the appellant; and (11) should have excluded discovery material that was produced to appellant late.

The county attorney and guardian ad litem cross-appeal, assigning as error the juvenile court's ultimate transfer of the matter to the Rosebud Sioux Tribal Court.

In her first and second assignments of error the mother generally alleges that the trial court obtained jurisdiction and that her parental rights were terminated in violation of the ICWA. The assignments are without merit.

While the mother contends that the ICWA has been violated in many ways, she makes no references to the record to where those violations may have occurred. She does refer in her argument to the incidents of the court's taking judicial notice of files containing evidence obtained in violation of the ICWA, which we shall address later in discussion of that specific assignment.

What the mother does address clearly is her general dissatisfaction regarding the fashion in which the juvenile court obtained jurisdiction in the adjudications of her children as neglected. Collateral attacks on previous proceedings are impermissible unless the attack is grounded upon the court's lack of jurisdiction over the parties or subject matter, in keeping with our decisions in *State v. Reuter*, 216 Neb. 325, 343 N.W.2d 907 (1984), and *State v. Kelly*, 212 Neb. 45, 321 N.W.2d 80 (1982). Such challenges should timely have been made after the adjudications, which were final orders, and we consider the first two assigned errors no further.

The third assignment of error alleges that the juvenile court took judicial notice of a juvenile court file which contained evidence admitted in violation of the ICWA and also that such notice violated the mother's rights to confrontation and cross-examination. Appellant objected at trial only to the court's taking judicial notice of the predispositional reports and the attachments thereto. We decide this case de novo on the record, as we have held that we are obliged to do, see *In re Interest of J.L.M. et al.*, 234 Neb. 381, 451 N.W.2d 377 (1990),

and will consider only the relevant and untainted evidence.

While we recognize the Nebraska Evidence Rules are not applicable in a dispositional hearing, including a hearing to terminate parental rights, the requirements of due process control a proceeding to terminate parental rights and the type of evidence which may be used by the State in an attempt to prove that parental rights should be terminated. See *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 417 N.W.2d 147 (1987).

> The improper admission of evidence by the trial court in a parental rights termination proceeding does not, however, in and of itself, constitute reversible error, for, as long as the appellant properly objected at trial, this court will not consider any such evidence in its de novo review of the record.

*In re Interest of D.S. and T.S.*, 236 Neb. 413, 414-15, 461 N.W.2d 415, 418 (1990).

It is obvious that fundamental due process is difficult to define. With reference to the evidence that is to be considered in a parental rights termination case, it is further obvious that in determining whether or not fundamental due process has been afforded to all persons interested in the proceedings, the Nebraska rules of evidence provide a guidepost in that determination. Thus, as in this principal case where hearsay evidence was excluded as fundamentally unfair, the Nebraska rules of evidence would similarly have prohibited the introduction of such evidence. Throughout this opinion we will specify what evidence we rely upon in arriving at the respective holdings.

In the mother's fourth assignment of error, she alleges that the petitioner had not provided qualified experts, in violation of the ICWA. The assignment is without merit.

The only expert witness to whom the mother objected at trial was Dr. Gary Melton, and thus, our review is limited to his status as an expert.

Pursuant to the ICWA, qualified expert testimony is required in a parental rights termination case on the issue of whether serious harm to the Indian child is likely to occur if the child is not removed from the home. See Guidelines for State

Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584, 67,593 (1979) (not codified).

The Bureau of Indian Affairs sets forth guidelines under which expert witnesses most likely will meet the requirements of the ICWA:

> (i) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices.

> (ii) A lay expert witness having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards in childrearing practices within the Indian child's tribe.

> (iii) A professional person having substantial education and experience in the area of his or her specialty.

*Id.*

Dr. Melton obtained a Ph.D. from Boston University, is licensed to practice psychology in Nebraska, and is a certified clinical psychologist with extensive clinical research experience with children. Dr. Melton's research revealed that there exist no comparative studies between Native American children and other children in their respective needs for stability and security.

Appellant's own experts, Dr. Garrett Grandbois and Clyde Tyndall, concur with a finding that Native American children need stability and, in fact, had recommended that the mother establish and maintain a stable home environment for her children.

Whether a witness is qualified to testify as an expert under Neb. Evid. R. 702 is a preliminary question of admissibility for a trial court under Neb. Evid. R. 104(1). Such a determination will be upheld on appeal unless the trial court's finding is clearly erroneous. *State v. Reynolds*, 235 Neb. 662, 457 N.W.2d 405 (1990).

In *Matter of Welfare of T.J.J.*, 366 N.W.2d 651, 655 (Minn. App. 1985), Minnesota's Court of Appeals noted in dicta that "a witness' background in Indian culture does not necessarily determine whether that witness is qualified as an expert under the Act."

Other courts have found that individuals who are professionals with substantial education and experience in psychology are deemed to be qualified experts under the ICWA. See *In re Kreft*, 148 Mich. App. 682, 384 N.W.2d 843 (1986).

We find that evidence existed to support the trial court's finding that Dr. Melton qualified as an expert. Dr. Melton possesses substantial education and experience in his area of specialty, and his lack of experience with the Indian way of life in no way compromised or undermined the value of his testimony. The assignment of error as to the use of his testimony at trial is therefore without merit.

As to the mother's fifth and sixth assignments of error regarding the propriety of the juvenile court's jurisdiction and failure to transfer the matter to the tribal court, we find the assignments are without merit.

The ICWA was enacted to promote the stability and security of Indian tribes and families through the establishment of minimum federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture.

When Congress enacted the ICWA, it had two main goals: (1) protecting the best interests of the Indian children and (2) promoting the stability and security of Indian tribes and families. See 25 U.S.C. § 1902. The act is based on the assumption that protection of the Indian child's relationship to the tribe is in the child's best interests. *Mississippi Choctaw Indian Band v. Holyfield*, 490 U.S. 30, 109 S. Ct. 1597, 104 L. Ed. 2d 29 (1989).

ICWA § 1911 mandates that the Indian tribe have jurisdiction in all child custody proceedings "involving an Indian child who resides or is domiciled within the reservation of such tribe, except where such jurisdiction is otherwise vested in the State by existing Federal law." The ICWA does not, however, divest state courts of their jurisdiction over children of Indian descent living off the reservation. *Kiowa Tribe of Oklahoma v. Lewis*, 777 F.2d 587 (10th Cir. 1985), *cert. denied* 479 U.S. 872, 107 S. Ct. 247, 93 L. Ed. 2d 171 (1986). State courts may exercise jurisdiction concurrently with the tribal

courts in regard to those Indian children who do not reside and are not domiciled on their tribe's reservation; however, a state court must refer the matter to a tribal court unless good cause is shown for the retention of state court jurisdiction. See 25 U.S.C. § 1911(b).

Under the ICWA, if the tribe or either parent of the Indian child petitions for transfer of the proceeding to the tribal court, the state court cannot proceed with the placement of an Indian child living outside a reservation without first determining whether jurisdiction of the matter should be transferred to the tribe. See § 1911(b).

At a hearing on a petition to transfer a termination of parental rights proceeding to tribal court under the ICWA, the party opposing the transfer has the burden of establishing that good cause not to transfer the matter exists. See, 25 U.S.C. § 1911(b); *Mississippi Choctaw Indian Band v. Holyfield, supra*.

Regardless of whether such tribal jurisdiction is concurrent with or exclusive of state jurisdiction, all courts in the United States must give full faith and credit to the child custody determinations of tribal courts to the same extent that full faith and credit are given to the decisions of any other entity. See 25 U.S.C. § 1911(d). In the case where applicable state or federal law provides a higher standard of protection to the rights of the parent or Indian custodian of the Indian child than the rights provided under the ICWA, the state or federal court shall apply the state or federal standard. 25 U.S.C. § 1921.

That a state court may take jurisdiction does not necessarily mean that it should do so, as the court should consider the rights of the child, the rights of the tribe, and the conflict of law principles, and should balance the interests of the state and the tribe. See *Application of Bertelson*, 189 Mont. 524, 617 P.2d 121 (1980).

Under the ICWA, factual support must exist in the trial record for the purposes of appropriate appellate review as to good cause for failure to comply with statutory child placement preference directives. *In re Interest of Bird Head*, 213 Neb. 741, 331 N.W.2d 785 (1983).

The Bureau of Indian Affairs has published nonbinding

federal guidelines interpreting the ICWA's definition of "good cause to the contrary" as including, but not limited to, cases where (1) the proceeding is at an advanced stage when the petition to transfer is received, and the petition is not promptly filed after receipt of notice; (2) the Indian child is over the age of 12 and objects to the transfer; (3) evidence necessary to decide the case cannot be adequately presented to the tribal court without undue hardship to the witnesses and parties; and (4) the parents of an Indian child over the age of 5 are not available, and the child has had little or no contact with the child's tribe or members of the child's tribe. Additionally, the guidelines specify that socioeconomic conditions and the perceived adequacy of tribal or Bureau of Indian Affairs social services or judicial systems may not be considered in determining whether good cause exists. The burden of establishing good cause shall be on the party opposing the transfer. Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584, 67,591 (1979) (not codified).

The third element of the guidelines has been applied to deny transfer due to considerations of forum non conveniens, such as availability of witnesses and access to proof. See *In Interest of J.R.H.*, 358 N.W.2d 311 (Iowa 1984). The Court of Appeals of South Carolina found in *Chester Co. Dept. of Soc. Serv. v. Coleman*, 296 S.C. 355, 372 S.E.2d 912 (S.C. App. 1988), that good cause may exist under the statute:

> What little we are able to glean from the record indicates that a biological parent of the two older girls, both of whom are over five years of age, may be unavailable; that none of the children has had any contact with the tribe or has resided on the reservation for a significant period of time; and that material witnesses and evidence relating to placement are in South Carolina, not South Dakota. These factors, together with evidence that removal of the children would be disruptive and detrimental to their best interests, may well constitute "good cause" for the family court to retain jurisdiction . . . .

*Id.* at 359, 372 S.E.2d at 915. Unable to make such a factual determination, the court remanded the cause for further consideration.

Iowa's Supreme Court, in *Interest of J.R.H., supra,* also interpreted "good cause" to include geographical conditions. The court subsequently found that there was good cause to deny transfer of the proceedings to the tribal court in South Dakota, as the evidence necessary to decide the case could not be adequately presented in the tribal court without undue hardship to the parties or witnesses.

In determining whether the doctrine of forum non conveniens should be invoked, the trial court should consider practical factors that make trial of the case easy, expeditious, and inexpensive, such as the relative ease of access to sources of proof, the cost of obtaining attendance of witnesses, and the ability to secure attendance of witnesses through compulsory process. *Matter of Wayne R.N.,* 107 N.M. 341, 757 P.2d 1333 (N.M. App. 1988).

The Supreme Court of South Dakota held in *Matter of Dependency and Neglect of A.L.,* 442 N.W.2d 233 (S.D. 1989), that notice of the proceeding concerning the dependency and neglect of children enrolled in the tribe gave the tribe actual notice, even though the tribe did not receive registered notice, and thus, the tribe's request to transfer the case to the tribal court was untimely where the tribe orally petitioned for transfer 1 year after receiving notice.

The Superior Court of Pennsylvania found in *In re Adoption of K.L.R.F.,* 356 Pa. Super. 555, 515 A.2d 33 (1986), that an adoptive Indian mother's placement of her Indian child with foster parents was temporary. Thus, the Indian mother had the right and ability under the federal ICWA to withdraw her consent to the placement and to effectuate the immediate return of the child, notwithstanding the fact that adoption may have been, at one time, the "ultimate objective" of the parties, where placement was purely consensual. The adoptive Indian parent furthermore had standing, the court found, to rely upon and demand compliance with provisions of the federal ICWA with respect to the action to terminate her parental rights.

This court, in *In re Interest of Bird Head,* 213 Neb. 741, 750, 331 N.W.2d 785, 791 (1983), recognized that the ICWA "does not change the cardinal rule that the best interests of the child are paramount, although it may alter its focus."

In *Matter of T.S.*, 245 Mont. 242, 801 P.2d 77 (1990), the Supreme Court of Montana found that the best interests of the child standard was applicable to a decision over whether to transfer the jurisdiction of a child custody proceeding to a tribal court. The evidence in *T.S.* was uncontroverted in indicating that the transfer of the child from a stable environment would devastate the child and have long-term harmful effects. The court further found that the transfer of jurisdiction to a tribal court was not mandated by the ICWA where, although the child was eligible for membership in an Eskimo tribe, neither the child nor her mother was a member of the tribe, the child had never lived on the reservation, and the child had never had any contact whatsoever with the tribe.

The Supreme Court of Oklahoma similarly found, in *Matter of N.L.*, 754 P.2d 863 (Okla. 1988), that the presence of the witnesses in Okmulgee County and the best interests of the child supported the finding of good cause to deny the mother's request for transfer of jurisdiction to the tribal court.

The California Court of Appeal held in *In re Robert T.*, 200 Cal. App. 3d 657, 246 Cal. Rptr. 168 (1988), that good cause existed for the denial of transfer of the proceeding from the state to the tribal court, for ICWA purposes, based on the delay of the tribe in expressing intent to intervene, the fact that the state court forum provided a better opportunity for production of valuable evidence, and the consideration that transfer of the proceeding to the tribal court would not be in the child's best interests.

Conversely, in *In re Armell*, 194 Ill. App. 3d 31, 550 N.E.2d 1060 (1990), the Appellate Court of Illinois strictly construed the Bureau of Indian Affairs guidelines in finding that the best interests of the child standard and the psychological effects of the transfer were inapplicable in the determination of whether "good cause" existed not to transfer the case to the tribal court.

The only remotely applicable federal case is *Mississippi Choctaw Indian Band v. Holyfield*, 490 U.S. 30, 109 S. Ct. 1597, 104 L. Ed. 2d 29 (1989), which stated that the domicile of illegitimate infants is that of their mother. In *Holyfield*, the mother's tribal reservation was the domicile of the twin infants, and the tribal court had exclusive jurisdiction over the custody

proceeding, even though neither of the twins had ever actually been on the reservation. *Holyfield* neither speaks to nor disposes of any issue in this case.

As to the juvenile court's decision to vacate the previous order of transfer to the Rosebud Sioux Tribal Court and retain the matter in the juvenile court, we affirm. The order of transfer to the tribal court was not a final order until the tribal court formally accepted the jurisdiction, and the judge explicitly stated as much in his order. Not unlike the option of revoking an offer prior to acceptance, the juvenile court had the discretion to revoke the "offer" of jurisdiction prior to the Rosebud Sioux Tribe's acceptance, and legitimately did so.

We next ask whether this discretion was abused. We find that neither the children nor their mother were domiciled on the reservation, transfer of jurisdiction is not mandatory, and good cause existed for retaining the matter in juvenile court.

The court stated, in its November 20, 1989, findings, its reasons for the finding of good cause. The court considered the 8-year history of the case, including the facts that the appellant opposed the 1982 transfer to the Oglala Sioux Tribe, pursuant to her right to do so under the ICWA, and that in 1982 the Oglala Sioux Tribal Court judge approved of placement of two of the children in non-Indian homes. Not only was the petition for transfer filed at an advanced stage in the proceedings, but all of the evidence was located in Lancaster County. To transfer the proceedings to the tribal court, located in South Dakota, would pose an undue hardship to the witnesses and parties, and in that we find good cause to retain the proceedings in the juvenile court. We affirm the juvenile court's decision to retain jurisdiction of the matter in that court.

Appellant also claims in the seventh assignment of error that her parental rights were terminated without the petitioner proving its case beyond a reasonable doubt or showing that the mother had caused any direct harm to the minor children.

While generally assigning whether the petitioner had met the burden of proof beyond a reasonable doubt, as required by 25 U.S.C. § 1912(f), appellant does not allege that the evidence was insufficient to terminate her rights, but only specifies that the experts produced by the petitioner were not qualified as

such under the ICWA. As we held above, the experts produced by the petitioner were qualified; thus, this assignment is without merit. We further find that the State has proven beyond a reasonable doubt that the best interests of the children require termination of appellant's parental rights.

As to the issue of whether proof of the mother's direct harm to the children exists, the record is replete with evidence of her addictions, as well as her subsequent denials regarding the addictions to alcohol and inhalants. During the trial regarding the issue of termination of parental rights, the mother was committed to a detoxification center for protective custody. She had been committed to the Hastings Regional Center between July and October 1989, she was scheduled for a mental health commitment hearing because her guardian ad litem alleged that she required commitment, and she spent a night in jail for disturbing the peace at the detoxification center. She also had served over 900 days in jail for offenses related to her alcohol and inhalant addictions.

Dr. Melton testified, as an expert witness, that the children would likely suffer serious emotional harm if returned to their mother now or in the near future and that continued contact would unsettle and undermine the stability of their current living situations.

The evidence supports a causal relationship between the mother's behavior and likely damage to the children, and we will not ask the children to wait and see whether their mother grows up in the future. She has not found the incentive to mature and change her lifestyle over the years this case has been progressing through the juvenile court, when that was the only obstruction to having her children returned to her.

Appellant alleged in the eighth assignment of error violations of the ICWA in the guardian ad litem's recommendations and evidence. She specifically cites that the guardian ad litem "tried to keep out evidence that the Appellant presented" and that the guardian ad litem did not make an effort to find proper placement of the children so that they "could avoid the certain identity crisis that they will now experience." Brief for appellant at 33. The mother does not argue the principles of the ICWA that have been violated.

We find this assignment without merit. Guardians ad litem have not been restricted in their presentation of evidence or participation at trial, and there is certainly no reason why a guardian ad litem for a child in a termination proceeding should be restricted. See, *In re Interest of D.S. and T.S.*, 236 Neb. 413, 461 N.W.2d 415 (1990); *In re Interest of D.D.P.*, 235 Neb. 864, 458 N.W.2d 193 (1990); *In re Interest of R.W.*, 236 Neb. 420, 461 N.W.2d 545 (1990).

Appellant did not argue the merits of her ninth assignment of error regarding the court's consideration of certain files as business records. We therefore do not consider it. See *In re Interest of P.M.C.*, 231 Neb. 701, 437 N.W.2d 786 (1989). The Nebraska Supreme Court rules address the same position at Neb. Ct. R. of Prac. 9D(1)(d) (rev. 1991), by stating that "consideration of the case will be limited to errors assigned *and* discussed." (Emphasis supplied.)

Appellant alleges in the 10th assignment of error that the juvenile court used violations of the ICWA as to placement and consequences of those violations against the appellant. The assignment is without merit.

ICWA § 1915 and Neb. Rev. Stat. § 43-1508 (Reissue 1988) require that Indian children be placed in foster care by a preference system: first, to an extended family member; then, to an Indian home specified by the child's tribe; then, to an Indian foster home; and finally, to an Indian institution. These placement preferences yield to the wishes of the parent when contrary to the statutory scheme, and will yield for other good cause. "For purposes of foster care, preadoptive or adoptive placement, a determination of good cause not to follow the order of preference set out above shall be based on one or more of the following considerations: (i) The request of the biological parents . . . ." 44 Fed. Reg. 67,594 (1979).

Upon initial placement of the children, efforts were made to locate Indian foster homes for them, but Indian foster homes were not available. Even during trial, attempts were made to find Indian families, to no avail.

The mother specifically requested on several occasions that her children be placed in non-Indian foster homes, specifically directing that she did not want the children placed with family

members. Additionally, the tribes with which the mother is associated did nothing to assist in the children's placement and honored her decision to allow the children to be placed in non-Indian foster homes.

Seven years after the case began and 10 months after the termination petition was filed, the mother filed a motion to change placement. She did not appear for hearing and presentation of evidence on that motion.

The mother's plea that placement was in violation of the ICWA is without merit due to the fact that she unilaterally made the determination that the placement of her children should deviate from the ICWA scheme, and we therefore affirm the juvenile court's decision to place the children with non-Indian families.

Appellant's final assignment of error raises the failure of the juvenile court to exclude certain discovery material that was produced to the appellant late. We have held that the party who challenges the trial court, asserting that the court abused its discretion with regard to sanctions imposed for discovery violations, must show that "the ruling of [the] judge [was] clearly untenable, depriving the litigant of a substantial right and denying a just result in the matter submitted for disposition." *D.S. v. United Catholic Soc. Servs.*, 227 Neb. 654, 666, 419 N.W.2d 531, 538 (1988). Appellant makes no such showing, and her assignment is without merit.

As to the cross-appeal of the Lancaster County Attorney and guardian ad litem for the children, we reverse the juvenile court's decision to transfer the proceedings to the Rosebud Sioux Tribal Court for the purpose of disposition or placement of the children.

We find *Mississippi Choctaw Indian Band v. Holyfield*, 490 U.S. 30, 109 S. Ct. 1597, 104 L. Ed. 2d 29 (1989), not dispositive of the present case. In that case, the U.S. Supreme Court held that a parent may not attempt to defeat the interests of the tribe by temporarily moving away from the reservation to give birth. While the case reflects that it is the tribe's decision to determine what is in the Indian child's best interests, the holding is applicable only where the child is deemed domiciled on the reservation.

Both Neb. Rev. Stat. § 43-1504(2) (Reissue 1988) and 25 U.S.C. § 1911(b) provide that a case of a nondomiciled Indian child only be transferred to the jurisdiction of the tribe upon request "in the absence of good cause to the contrary." As stated above, one of the goals of the ICWA is to protect the best interests of Indian children, as recognized and upheld by numerous courts across the country.

The Arizona Court of Appeals, in *Matter of Appeal in Maricopa County*, 136 Ariz. 528, 667 P.2d 228 (Ariz. App. 1983), considered, in an adoption case, the length of time a child had been with the adoptive mother, the occurrence of bonding, and testimony that removal of the child would cause psychological damage to the child. The court expounded that from the congressional policy, "[i]t is patently clear that Congress envisioned situations in which the child's best interest may override a tribal or family interest—the preferences for placement are to be followed absent 'good cause to the contrary.' [25 U.S.C.] § 1915(a),(b)." 136 Ariz. at 534, 667 P.2d at 234.

In *Matter of Adoption of T.R.M.*, 525 N.E.2d 298 (Ind. 1988), the Indiana court dealt with a child who had lived with the same foster family all of her 7 years of life, recognizing that

[to] now sever and dislodge the child from the family and culture she has known during all of her seven years of life cannot be anything except devastating to the best interests of the child. The purpose of the ICWA, to protect the interests of the Indian family, is patently clear. However, a paramount interest is the protection of the best interests of the child.

*Id*. at 308.

Largely by their mother's choice, the children involved in this situation have had little exposure to their Indian culture, and the value of transfer to the tribe with future exposure to the Indian ways of life must be balanced first against the detrimental consequences these children will suffer due to the separation from the psychological parents to whom the children have bonded and become attached. Secondly, we must consider the cultural adjustments that these children, who have not lived in an Indian environment, would have to make and

their individual abilities to make those adjustments, as established by the testimony of qualified expert witnesses. See *In Interest of J.R.H.*, 358 N.W.2d 311 (Iowa 1984).

One of the qualified expert witnesses, Dr. Melton, testified that removing the children from present foster homes and placing them in equally stable foster homes would have significant consequences, would be emotionally upsetting, and would produce psychological disorganization.

Another expert witness, Professor Ann Coyne, specializes in bonding and attachment and in separation and loss, and has experience working with special needs children, tribes, and the Department of Social Services. She explained the nature of bonding and that the consequences of breaking attachments for children include short-term memory deficits, speech and language problems, and posttraumatic stress that manifests itself in children as depression and difficulty in relating to others. As Professor Coyne testified, "[F]or a child, there's nothing more desparate [sic] than to be removed from the person to whom they are attached." Professor Coyne testified that the grief process in children takes at least 6 to 8 years from the time of the loss and that, in this case, transfer to the tribe and the inevitable grief over losing their psychological parents would compromise the children's ability to benefit from that culture because they would be too busy grieving and dealing with the loss of the attachment.

From the beginning, the mother refused to allow transfer of her children's cases to the tribal court and demanded that her children be placed in non-Indian homes. While she may be entitled to change her mind, we cannot and will not close our eyes to the extensive bonding and attachment these children have experienced with the foster families who now wish to adopt them, in the 7 years the mother has adhered to her initial position.

Although we realize that the guidelines deem inappropriate considerations of tribal socioeconomic considerations and the perceived adequacy of the tribal or Bureau of Indian Affairs social services or judicial systems, we also recognize that, in the case of two of the children, those considerations become necessary to a determination of the best interests of the children

and, therefore, "good cause" not to transfer the case. Both C.W. and M.W. are mentally handicapped and have special needs which the law specifically requires that we consider. See 25 U.S.C. § 1915 (b). See, also, 44 Fed. Reg. 67,584, 67,594 (1979). The children will suffer if their respective foster homes, the only stability they have ever known, are taken away from them.

The judgment terminating parental rights is affirmed. That part of the court's judgment transferring custody to the Rosebud Sioux Tribal Court for disposition is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

AFFIRMED IN PART, AND IN PART REVERSED AND
REMANDED FOR FURTHER PROCEEDINGS.

SHANAHAN, J., concurring.

Although the result reached today by the majority of this court is correct, I disagree with the majority's route to that result.

While the majority reiterates that "the Nebraska Evidence Rules are not applicable in a dispositional hearing, including a hearing to terminate parental rights," the majority, nevertheless, proceeds to discuss the admissibility of testimony from Dr. Gary Melton, a psychologist, and concludes that Melton's testimony is admissible because he was a witness "qualified to testify as an expert under Neb. Evid. R. 702," which was the trial court's finding on a preliminary question of admissibility and a conclusion which, under the circumstances and the Nebraska Evidence Rules, is not clearly erroneous. The majority's acknowledgment that the Nebraska Evidence Rules are inapplicable in proceedings to terminate parental rights renders the majority's discussion about admissibility of an expert's testimony under the Nebraska Evidence Rules both incongruous and unnecessary. That, however, may be the least incongruous feature of the majority's opinion in this case.

The majority then states that "the Nebraska rules of evidence provide a guidepost" in determining whether evidence adduced over a parent's objection at a hearing to terminate parental rights is reconcilable with procedural due process. The expression about a "guidepost" supplies no answer to the

question: Is application of the Nebraska Evidence Rules necessary for procedural due process in a hearing to terminate parental rights under the Nebraska Juvenile Code?

To answer the preceding question about procedural due process, we must operate from two premises. First, the parent-child relationship is accorded due process protection. Second, rules of evidence are reliable standards for presentation of information to produce reasonably trustworthy resolutions of controversies submitted to the judicial process.

Support for our first premise is found in decisions by the U.S. Supreme Court as well as decisions of this court. *Lassiter v. Department of Social Services*, 452 U.S. 18, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981), involved due process considerations for proceedings to terminate parental rights. In *Lassiter*, the Court observed:

> For all its consequence, "due process" has never been, and perhaps can never be, precisely defined. "[U]nlike some legal rules," this Court has said, due process "is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria Workers v. McElroy*, 367 U. S. 886, 895. Rather, the phrase expresses the requirement of "fundamental fairness," a requirement whose meaning can be as opaque as its importance is lofty. Applying the Due Process Clause is therefore an uncertain enterprise which must discover what "fundamental fairness" consists of in a particular situation by first considering any relevant precedents and then by assessing the several interests that are at stake.

452 U.S. at 24-25.

The *Lassiter* Court continued:

> This Court's decisions have by now made plain beyond the need for multiple citation that a parent's desire for and right to "the companionship, care, custody and management of his or her children" is an important interest that "undeniably warrants deference and, absent a powerful countervailing interest, protection." *Stanley v. Illinois*, 405 U. S. 645, 651. Here the State has sought not simply to infringe upon that interest, but to end it. If the State prevails, it will have worked a unique kind of

deprivation. . . . A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one.

452 U.S. at 27.

Shortly after *Lassiter*, the Supreme Court decided *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). The Court remarked:

In *Lassiter*, it was "not disputed that state intervention to terminate the relationship between [a parent] and [the] child must be accomplished by procedures meeting the requisites of the Due Process Clause." [Citations omitted.] The absence of dispute reflected this Court's historical recognition that freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment. [Citations omitted.]

The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing. family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.

455 U.S. at 753-54. Further, in *Santosky*, the Court noted:

"The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be 'condemned to suffer grievous loss.' " [Citations omitted.] . . .

. . . When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it.

455 U.S. at 758-59. Finally, in *Santosky*, the Court concluded that "the child and his parents share a vital interest in preventing erroneous termination of their natural

relationship." 455 U.S. at 760.

In other decisions, the Supreme Court has indicated that a state may not constitutionally terminate parental rights without showing parental unfitness. See *Quilloin v. Walcott*, 434 U.S. 246, 255, 98 S. Ct. 549, 54 L. Ed. 2d 511 (1978):

> We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected. . . .
>
> We have little doubt that the Due Process Clause would be offended "[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest." *Smith v. Organization of Foster Families*, 431 U.S. 816, 862-863 (1977) (Stewart, J., concurring in judgment).

See, also, *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972) (the integrity of the family unit is protected by the due process clause of the fourteenth amendment); *In re Interest of R.G.*, 238 Neb. 405, 470 N.W.2d 780 (1991) (the parent-child relationship involves a liberty interest).

The Supreme Court's views concerning the requirement of due process for a hearing to terminate parental rights, expressed in *Santosky v. Kramer, supra,* and *Lassiter v. Department of Social Services, supra,* have been adopted by this court regarding the Nebraska Juvenile Code. See, *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 417 N.W.2d 147 (1987); *In re Interest of L.J., J.J., and J.N.J.*, 220 Neb. 102, 368 N.W.2d 474 (1985). Thus, a parent has a fundamental interest in avoiding erroneous termination of parental rights. See, *Smith v. Organization of Foster Families*, 431 U.S. 816, 97 S. Ct. 2094, 53 L. Ed. 2d 14 (1977); *Santosky v. Kramer, supra*.

Having concluded that the parent-child relationship is an interest which is entitled to due process protection, we must now decide whether current Nebraska procedure affords that constitutional protection or, as the Supreme Court expressed in *Smith v. Organization of Foster Families, supra*:

> Where procedural due process must be afforded because a "liberty" or "property" interest is within the

Fourteenth Amendment's protection, there must be determined "what process is due" in the particular context. . . .

. . . "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U. S. 471, 481 (1972). 431 U.S. at 847-48.

Under 25 U.S.C. § 1912(f) (1988) of the U.S. Indian Child Welfare Act and Neb. Rev. Stat. § 43-1505(6) (Reissue 1988) of the Nebraska Indian Child Welfare Act, a determination to terminate parental rights must be "supported by evidence beyond a reasonable doubt." However, in proceedings that are not subject to the federal and Nebraska Indian Child Welfare Acts, "termination of parental rights is permissible when the basis for such termination is proved by clear and convincing evidence." *In re Interest of T.C.*, 226 Neb. 116, 117, 409 N.W.2d 607, 609 (1987). Accord, *In re Interest of M.P.*, 238 Neb. 857, 472 N.W.2d 432 (1991); *In re Interest of J.L.M. et al.*, 234 Neb. 381, 451 N.W.2d 377 (1990); *In re Interest of L.H.*, 227 Neb. 857, 420 N.W.2d 318 (1988). See, also, *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982).

In *In re Interest of J.S., A.C., and C.S., supra,* we noted that the Nebraska Evidence Rules do not apply in a dispositional hearing for a child under the Nebraska Juvenile Code because the foremost purpose or objective of the code is promotion and protection of a juvenile's best interests and, therefore, "[t]o accomplish such goal and fashion a dispositional remedy beneficial to the juvenile, a judge should have access to the best available evidence which is relevant, reliable, and trustworthy concerning a correct disposition for the juvenile." 227 Neb. at 263, 417 N.W.2d at 156.

While Neb. Rev. Stat. § 43-283 (Reissue 1988) states, "Strict rules of evidence shall not be applied at any dispositional hearing," we have concluded that the "rules of evidence" mentioned in § 43-283 are the Nebraska Evidence Rules. See *In re Interest of J.S., A.C., and C.S., supra.* However, one readily notes that § 43-283 does not contain a definition or characterization for "dispositional hearing," and employs language identical to its statutory predecessor, § 43-206.03(4)

(Reissue 1978): "Strict rules of evidence shall not be applied at any dispositional hearing." Legislative history for § 43-283 (Reissue 1988) and § 43-206.03(4) (Reissue 1978) supply no information or indication of the Legislature's intent for the meaning of "dispositional hearing." Rather, the first one encounters "dispositional hearing" in relation to proceedings to terminate parental rights and applicable rules of evidence is in *State v. Bailey*, 198 Neb. 604, 254 N.W.2d 404 (1977), when this court, without explanation for its conclusion, stated:

> Appellants urge that their objections should have been sustained and that the exhibits should not have been received or considered. Section 43-206.03(4), R. S. Supp., 1976, provides that strict rules of evidence shall not be applied at any dispositional hearing. Under such a statute, the Juvenile Court may exercise a sound discretion in respect to determining the relevancy, competency, and admissibility of testimony to be considered at a dispositional hearing. We find no abuse of discretion by the Juvenile Court.

198 Neb. at 608, 254 N.W.2d at 407. The preceding pronouncement regarding admissibility of evidence was thereafter confirmed during review of a judgment terminating parental rights in *State v. Duran*, 204 Neb. 546, 552, 283 N.W.2d 382, 386 (1979), when the court expressed:

> We first point out that section 43-206.03(4), R. R. S. 1943, provides that strict rules of evidence shall not apply at any dispositional hearing. As we have previously stated, the juvenile court may exercise a sound discretion in determining the relevancy, competency, and admissibility of evidence to be considered at a dispositional hearing. State v. Bailey, 198 Neb. 604, 254 N.W.2d 404 (1977).

Thus, *Bailey* and *Duran* began a line of Nebraska decisions, which includes today's decision, in repeated reaffirmation that the Nebraska Evidence Rules do not apply at a hearing to terminate parental rights. Thus, inapplicability of the Nebraska Evidence Rules at a hearing to terminate parental rights is not the result of a legislatively expressed directive, but originated and has evolved through judicial interpretation of statutes pertaining to rules of evidence at a hearing to terminate

parental rights as a "dispositional hearing." It is quite likely that the Legislature, when enacting § 43-283, envisioned that a "dispositional hearing" meant a hearing for personal disposition of a child who is subject to the Nebraska Juvenile Code, and very unlikely that the Legislature viewed the parent-child relationship as so insignificant or valueless that the relationship might be extinguished on the basis of unreliable or untrustworthy information presented to a court.

Because the parent-child relationship is entitled to protection of due process and, further, since a parent has a recognized interest in avoiding an erroneous termination and extinction of that valuable right and relationship, Nebraska procedure for a hearing to terminate parental rights must provide reasonable assurance that a parent may avoid an erroneous termination of parental rights, and further requires that parental unfitness, as a prerequisite to termination of parental rights, be established by proof that is clear and convincing unless the proceeding is governed by the federal or Nebraska Indian Child Welfare Act, in which case proof must be beyond a reasonable doubt. Notwithstanding prior decisions of this court interpreting § 43-283 and reaffirming inapplicability of the Nebraska Evidence Rules in a hearing to terminate parental rights, due process requires a procedure that reduces the risk of a parental rights termination resting on erroneous information presented to a juvenile court and that promotes production of proof which is clear and convincing or, in proceedings subject to the federal or Nebraska Indian Child Welfare Act, proof which is beyond a reasonable doubt. Certainly, application of the Nebraska Evidence Rules as reliable standards for presentation of information at a hearing to terminate parental rights is a step in the right direction for reducing the risk of an erroneous extinguishment of parental rights and will tend to supply courts with trustworthy information for resolving a question about parental unfitness, a resolution which must be made through proof which is clear and convincing or, in proceedings governed by the federal or Nebraska Indian Child Welfare Act, proof which is beyond a reasonable doubt. Additionally, application of the Nebraska Evidence Rules should eliminate horrible hearsay, see *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251,

417 N.W.2d 147 (1987), wading through dozens of documents, see *In re Interest of A.H.*, 237 Neb. 797, 467 N.W.2d 682 (1991), and a jumble of judicial notice, see *In re Interest of J.L.M. et al.*, 234 Neb. 381, 451 N.W.2d 377 (1990), which seem to be ever-present problems in hearings to terminate parental rights.

Consequently, in accordance with due process under Neb. Const. art. I, § 3, the time has come to require that the Nebraska Evidence Rules shall be applied in a hearing to terminate parental rights, a requirement which will supply reliable and express standards for production of reasonably trustworthy information to resolve controversies between the State of Nebraska and one whose parental rights are sought to be terminated under the Nebraska Juvenile Code. Thus, while due process may never be precisely defined, fundamental fairness requires and exists in reducing the risk of an erroneous termination of parental rights through unreliable and untrustworthy information presented to a juvenile court. For that reason, the Nebraska Evidence Rules, as an aspect of due process, should apply at a hearing to terminate parental rights.

In the present case, when the Nebraska Evidence Rules are applied, the State presented sufficient admissible evidence to demonstrate, beyond a reasonable doubt, that termination of parental rights was required under the circumstances, the conclusion reached by the trial court and this court; hence, the trial court's judgment must be affirmed.

CAPORALE, J., joins in this concurrence.