657 N.E.2d 935 (1995)
167 Ill.2d 250
212 Ill.Dec. 590
In re ADOPTION OF S.S. & R.S.
(Leslie Scarlotte Tubridy et al., Appellants,
v.
Betty Jo Iron Bear et al., Appellees).
No. 76486.
Supreme Court of Illinois.
October 19, 1995.
*937 Bruce D. Strom (argued), Strom & Repay, and Richard P. Bingham, Juergensmeyer, Strain & Associates, Elgin, for appellants.
Kathryn McGowan Bettcher, Sarah Megan and Bernard H. Shapiro, Prairie State Legal Services, Inc., St. Charles, for appellee Betty Jo Iron Bear.
Gary M. Beaudry, Williston, North Dakota, for appellees Fort Peck Assiniboine and Sioux Tribes.
Carole J. Grahn-Hayes, Geneva, for Guardian Barbara Carlson.
Justice HARRISON delivered the judgment of the court and the following opinion:
This appeal arises from a proceeding involving termination of the parental rights of a Native American Indian mother, Betty Jo Iron Bear, and the adoption of her minor children, S.S. and R.S., by two of their non-Indian relatives, Leslie and Patrick Tubridy. The issue before us is whether the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq. (1988)) requires the cause to be transferred to the tribal court of the Fort Peck tribe, on whose reservation Iron Bear is domiciled, even though the children's non-Indian father had been granted sole physical custody of them prior to his death and the allegations of the Tubridys' petition, if proven by clear and convincing evidence, would be sufficient to establish that Iron Bear had abandoned the children.
Following a hearing, the circuit court of Kane County denied motions by Iron Bear and the Fort Peck tribe to have the cause transferred to the tribal court. On an interlocutory appeal pursuant to Supreme Court Rule 306(a)(1)(v) (134 Ill.2d R. 306(a)(1)(v)), a divided appellate court held that the tribal *938 court had exclusive jurisdiction over the matter under section 1911 of the ICWA (25 U.S.C. § 1911 (1988)). It therefore reversed and remanded with directions to transfer the cause to that court. (252 Ill.App.3d 33, 190 Ill.Dec. 802, 622 N.E.2d 832.) We granted the Tubridys' petition for leave to appeal (145 Ill.2d R. 315) and now reverse and remand to the circuit court for further proceedings with respect to the question of the children's domicile.
There is no dispute that Iron Bear is a member of the Fort Peck tribe and lives on the Fort Peck reservation in Poplar, Montana. She is the biological mother of S.S. and R.S., who were fathered by Richard S., a non-Indian. Richard S. died on November 18,1992, of a disease he contracted from Iron Bear. The two were never married.
Although S.S. and R.S. are enrolled members of the tribe, they have been raised predominantly in Illinois by Richard and his family. Iron Bear has never played more than a sporadic role in their lives. In 1990, Richard filed a parentage action in Kane County which resulted in the approval of a joint custody and parenting agreement pursuant to which Richard was awarded physical custody of the children for 10 months of the year. Although Iron Bear was awarded physical custody of them for the remaining two months, the children visited the Fort Peck reservation only once after the agreement was reached.
In April 1992, the circuit court of Kane County granted a petition by Richard for the termination of Iron Bear's physical custody rights to the children. Iron Bear claims the order was entered by default because she was unable to appear due to indigence, but the Tubridys say this is not so. They assert that despite her poverty, Iron Bear has consistently had legal representation.
Until shortly before Richard's death, the children resided with him in Elgin. When Richard became too ill to care for the children and himself, the three moved in with one of Richard's sisters, Shelly S., in Carpentersville, where, it appears, the children are still living. Richard was not a Native American and did not associate with any Indian tribe. In addition, neither child has had any significant interaction with an Indian tribe beyond their one visit to the reservation.
Six days after Richard's death, the Tubridys filed a petition to terminate Iron Bear's parental rights and to adopt the children, as Richard had requested in his will. Leslie Tubridy is another of Richard's sisters, and she and Patrick are the paternal aunt and uncle of S.S. and R.S. The basis they asserted for termination of parental rights was that Iron Bear was an unfit parent. The Tubridys charged that Iron Bear had abandoned the children during the two years prior to the adoption proceedings. Before that time, the Tubridys alleged, she engaged in open and notorious fornication, habitually abused alcohol, and failed to provide the children with adequate food, clothing and shelter even though she was physically and financially able to do so.
Iron Bear responded by filing a petition for an emergency order of protection. In that petition she asserted that she had traveled to Illinois upon learning of Richard's death, but that Shelly S. had refused to allow her to see the children or to disclose their whereabouts. She further claimed, upon information and belief, that the Turbidys had fled with the children to the Tubridy home in Ohio. As a result, the court entered an order requiring immediate return of the children to Illinois, and there is no dispute that they are now back in this State.
At the same time she sought the protective order, Iron Bear moved to transfer jurisdiction of the adoption proceeding to the Fort Peck tribal court in Poplar, Montana, and to dismiss the State-court proceeding. Shortly thereafter, the tribe filed a substantially identical motion. The motions invoked section 1911(a) of the ICWA, which states that the tribe has "jurisdiction exclusive as to any State over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of such tribe, except where such jurisdiction is otherwise vested in the State by existing Federal law." (25 U.S.C. § 1911(a) (1988).) Iron Bear and the tribe argued that S.S. and R.S. are "Indian children," as that term is defined in section 1903(4) of the Act (25 U.S.C. *939 § 1903(4) (1988)) and that, like Iron Bear, both children are enrolled members of the Fort Peck tribe, a federally recognized "Indian tribe," as defined by section 1903(8) of the ICWA (25 U.S.C. § 1903(8) (1988)). Iron Bear alleged that because she is the sole parent of S.S. and R.S. and because she is domiciled on the Fort Peck reservation, the domicile of the children is also on the reservation (Mississippi Band of Choctaw Indians v. Holyfield (1989), 490 U.S. 30,109 S.Ct. 1597, 104 L.Ed.2d 29), and that the tribe therefore has exclusive jurisdiction over the matter of the children's adoption.
In their response, the Tubridys contended that the ICWA is inapplicable. They argued that the purpose of the Act is to prevent the breakup of Indian families, and that S.S. and R.S. are not domiciliaries of an Indian reservation or part of an Indian family. They alleged that R.S. was born in Elgin, Illinois, and that both R.S. and S.S. had lived substantially all of their lives there with their non-Indian father, who did not associate with or encourage the children's association with an Indian tribe. The Tubridys claimed that the children's part-Indian ancestry has no relation to their average suburban upbringing because neither child had ever resided on or near an Indian reservation for any significant period of time or had any significant contact or interaction with an Indian tribe. According to the Tubridys, jurisdiction belongs in the State court because Richard had sought and obtained sole physical custody of the children and had stated prior to his death that he did not want Iron Bear or her relatives to obtain custody of the children, which actions constituted a "parental objection" under section 1911(b) of the ICWA to the transfer of jurisdiction to the tribal court. The Tubridys also argued that the ICWA permits State courts to retain jurisdiction if there is "good cause," and that the facts of this case establish that the best interests of the children constitute such "good cause."
After arguments on the issue of jurisdiction, the circuit court denied the motions to transfer, finding that the children are not and have never been domiciled on the reservation and that the ICWA was inapplicable. The appellate court, with one justice dissenting, held that the provisions of the ICWA did apply here and that the children were domiciliaries of the reservation. The court therefore reversed and remanded the cause to the trial court with directions to transfer jurisdiction to the Fort Peck tribal court.
We begin our review of the case with the provisions of the ICWA. That legislation was enacted by Congress in 1978 in response to extensive evidence indicating that large numbers of Indian children were being separated from their families and their tribes and were being placed in non-Indian homes through State foster care placement and adoption proceedings. (Holyfield, 490 U.S. at 32, 109 S.Ct. at 1600, 104 L.Ed.2d at 36.) This practice caused serious harm to the Indian children, their parents and their tribes.
Evidence at congressional hearings included testimony concerning problems experienced by the children during adolescence, such as difficulty coping in a white society even where they had been raised in a purely white environment. There was also considerable emphasis during the hearings on how placements of Indian children into non-Indian families adversely affected the tribes' ability to function as self-governing communities. Sponsors of the ICWA noted that Indian tribes and Indian people were being drained of their children and, as a result, the future of the tribes and Indian people was being placed in jeopardy. Holyfield, 490 U.S. at 33-34 & n. 3, 109 S.Ct. at 1600-01 & n. 3, 104 L.Ed.2d at 36-37 & n. 3.
In enacting the ICWA, Congress incorporated the following statement of findings:
"Recognizing the special relationship between the United States and the Indian tribes and their members and the Federal responsibility to Indian people, the Congress finds (1) that * * * [through the authority of the United States Constitution], Congress has plenary power over Indian affairs; (2) that Congress, through statutes, treaties, and the general course of dealing with Indian tribes, has assumed the responsibility for the protection and preservation of Indian tribes and their resources;

*940 (3) that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children and that the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe;
(4) that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and
(5) that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." (25 U.S.C. § 1901 (1988).)
Congress declared it to be the policy of the United States:
"to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture * * *." 25 U.S.C. § 1902 (1988).
At the heart of the ICWA are its provisions concerning jurisdiction over Indian child custody proceedings. (Holyfield, 490 U.S. at 36, 109 S.Ct. at 1601, 104 L.Ed.2d at 38.) A "child custody proceeding" as defined by the ICWA refers to any proceeding involving foster care placement, termination of parental rights, preadoptive placement or adoptive placement. (25 U.S.C. § 1903(1) (1988).) The only two exceptions from that definition are awards of custody to one of the parents in divorce proceedings and delinquency proceeding placements. (25 U.S.C. § 1903(1) (1988).) The ICWA defines an "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4) (1988).) The definition of an "Indian child's tribe" relevant to this appeal is "the Indian tribe in which an Indian child is a member or eligible for membership." 25 U.S.C. § 1903(5) (1988).
Under section 1911(a) the tribal court possesses exclusive jurisdiction "over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of such tribe." (25 U.S.C. § 1911(a) (1988).) In the case of Indian children not domiciled or residing within the reservation of the child's tribe, section 1911(b) creates concurrent but presumptively tribal jurisdiction, and requires State courts to transfer jurisdiction over the proceedings to the tribal court, except in cases of "good cause," objection by either parent, or declination of jurisdiction by the tribal court. 25 U.S.C. § 1911(b) (1988).
It is undisputed that the proceeding before us is a "child custody proceeding" and that S.S. and R.S. qualify as "Indian children" within the meaning of the ICWA. For the purposes of determining who should have jurisdiction of the proceeding under the Act, the initial question we must resolve is the location of their domicile. In reversing the circuit court, the appellate ruled, based on Holyfield, that the children's domicile was the same as that of their mother, Iron Bear, i.e., the Fort Peck reservation. In our view, however, Holyfield does not compel that result.
In Holyfield, the United States Supreme Court considered the issue of the domicile of twin infants born to unmarried Indian parents. The parents, enrolled members of the Choctaw tribe and domiciliaries and residents of the Choctaw reservation in Nashoba County, Mississippi, traveled 200 miles off the reservation, to Harrison County, Mississippi, for the twins' birth, and immediately thereafter executed consent-to-adoption forms. Two months after a final decree of adoption was entered by the State court, the tribe moved to vacate the decree on the ground that the ICWA vested it with exclusive jurisdiction over the adoption proceeding *941 because the parents were members of the tribe and domiciliaries of the reservation. Recognizing that the jurisdictional question turned on whether the children were domiciled on the reservation, the Supreme Court of Mississippi determined that they were not and, thus, affirmed the decree of the lower court.
Before reaching the specific issue of domicile, the United States Supreme Court in Holyfield examined the previously discussed legislative history and underlying policies of the ICWA. Noting, then, that "domicile" is not defined in the ICWA, the United States Supreme Court stated that the meaning of "domicile" is a matter of Congress' intent. (Holyfield, 490 U.S. at 43, 109 S.Ct. at 1605, 104 L.Ed.2d at 43.) The Court rejected the notion that Congress intended the definition of "domicile" to be a matter of State law. First, the Court determined that the purpose of the ICWA gave no reason to believe that Congress intended to rely on State law for the definition of a critical statutory term. To the contrary, the Court found from the text of the ICWA and its legislative history and hearings that the purpose of the ICWA was, in part, to make clear that in certain situations the State courts did not have jurisdiction over child custody proceedings (Holyfield, 490 U.S. at 43-45, 109 S.Ct. at 1606-07, 104 L.Ed.2d at 43-44), and that the main effect of the ICWA was to curtail the authority of individual States (Holyfield, 490 U.S. at 45 n.17, 109 S.Ct. at 1606 n. 17, 104 L.Ed.2d at 44 n. 17). The Court observed:
"Indeed, the congressional findings that are part of the statute demonstrate that Congress perceived the States and their courts as partly responsible for the problem it intended to correct. [Citation.] Under these circumstances, it is most improbable that Congress would have intended to leave the scope of the statute's key jurisdictional provision subject to definition by state courts as a matter of state law." (Holyfield, 490 U.S. at 45, 109 S.Ct. at 1606-07, 104 L.Ed.2d at 44.)
In further support of its position, the Holyfield Court also noted that resort to State law definitions of domicile would result in the lack of nationwide uniformity and could even produce a situation where the ICWA would be applied differently to the same child simply as a result of where the child was located or transported. Reasoning that Congress could hardly have intended such a result, the Court concluded that Congress must have intended a uniform Federal law of domicile for the ICWA. Holyfield, 490 U.S. at 45-47, 109 S.Ct. at 1607, 104 L.Ed.2d at 44-45.
The Court then looked to the generally accepted meaning of the term "domicile," borrowing from "established commonlaw principles of domicile to the extent that they are not inconsistent with the objectives of the congressional scheme." (Holyfield, 490 U.S. at 47-48, 109 S.Ct. at 1608, 104 L.Ed.2d at 46.) Citing the Restatement (Second) of Conflict of Laws, sections 11 through 23 (1971), and other commentaries and decisional law, the Court noted that it was generally uncontroverted that "domicile" is not necessarily synonymous with "residence" and that one can reside in one place but be domiciled in another. In the case of adults, domicile is established by physical presence in a place in connection with an intention to remain there. Because most minors are legally incapable of forming the requisite intent to establish a domicile, however, their domicile is usually determined by that of their parents. Traditionally, in the case of children born out of wedlock, the child takes the domicile of the mother. (Holyfield, 490 U.S. at 48, 109 S.Ct. at 1608, 104 L.Ed.2d at 46.) Observing that the domicile of the twins' mother, as well as the father, had at all times been on the reservation, the Court found it indisputable that the domicile of the twins was also on the reservation even though they had never been there. Holyfield, 490 U.S. at 48-49, 109 S.Ct. at 1608, 104 L.Ed.2d at 46-47. See also In re Adoption of a Baby Child (App.1985), 102 N.M. 735, 700 P.2d 198, 200-01 (child's domicile was that of the mother on the reservation).
The situation in this case is distinguishable. Although Iron Bear was domiciled on the reservation, the children's father was not, had never been, and did not want to be. His domicile was in Illinois. Because he had sole custody of the children, that was their domicile as well.
*942 Upon the father's death, the domicile of the children would normally have reverted to that of their mother. People ex rel. Noonan v. Wingate (1941), 376 Ill. 244, 249, 33 N.E.2d 467 (at common law upon the death of the father an infant took the domicile of its mother); 25 Am.Jur.2d Domicil § 67 (1966) (upon the death of the parent to whom custody of a child has been awarded the domicile of the child becomes that of the surviving parent); Restatement (Second) of Conflict of Laws § 22, Comment b, at 63 (1971) (upon the death of the parent who has been awarded legal custody of the child or with whom the child has been living, the child's domicile shifts to that of the other parent even though the latter is domiciled in another State).
An exception to this general rule has been recognized, however, where the surviving parent has abandoned the child. (Restatement (Second) of Conflict of Laws § 22, Comments e, i (1971).) If a child is left parentless as a result of death and/or abandonment, and no legal guardian of the child's person has been appointed, the child takes the domicile of the person who stands in loco parentis to him and with whom he lives. Restatement (Second) of Conflict of Laws § 22, Comment i (1971); see Donlon v. Miller (1976), 42 Ill.App.3d 64, 71, 355 N.E.2d 195.
An important limitation on this rule is that the doctrine of abandonment cannot be used by Native American Indian parents as part of a scheme to facilitate adoption of their children by non-Indians while they remain domiciliaries of the reservation. Otherwise, the purpose of the ICWA would be undermined, and the tribe's ability to assert its interest in its children would be weakened. (Holyfield, 490 U.S. at 52,109 S.Ct. at 1610, 104 L.Ed.2d at 49. In re Adoption of Halloway (Utah 1986), 732 P.2d 962, 969.) In this case, however, there plainly was no such scheme, and application of the common law abandonment doctrine can do no possible violence to the purposes of the Act. Accordingly, if Iron Bear were found to have abandoned her children, the children's domicile would remain in Illinois even after their father's death.
For the purposes of establishing domicile, abandonment occurs when the parent deserts the child or when the parent gives custody of the child to another with the intention of relinquishing his parental rights and obligations. To determine whether an abandonment has taken place, the rules of the forum are normally applied. (Restatement (Second) of Conflict of Laws § 22, Comment e (1971).) If substantiated at a hearing in a trial court, the allegations made by the Tubridys would be sufficient under Illinois law to find abandonment. Because of the procedural posture of this case, however, there has never been a hearing to determine whether Iron Bear has abandoned her children. Given the importance of the abandonment issue to resolution of where the children are domiciled, the judgments of the circuit and appellate courts must therefore be reversed, and the cause must be remanded to the circuit court for a finding as to whether Iron Bear abandoned R.S. and S.S. If the hearing discloses that there has not been abandonment, then the children would have to be deemed domiciliaries of the reservation, the tribe would have exclusive jurisdiction under section 1911(a) of the ICWA (25 U.S.C.§ 1911(a) (1988)), and the circuit court of Kane County would be required to transfer the cause to the Fort Peck tribal court.
On the other hand, if Iron Bear were proven to have abandoned her children, then the tribe would not have exclusive jurisdiction under section 1911(a) because the children would then neither reside nor be domiciled on the reservation. Instead, the operative provision would be section 1911(b) of the ICWA (25 U.S.C. § 1911(b) (1988)), which confers concurrent jurisdiction on the State courts along with the tribal court where the child is not domiciled and does not reside on the reservation. Under section 1911(b), there is still a presumption that the tribal court should hear the case, but transfer to the tribal court is not required where there is objection by either parent or where the trial court finds good cause to deny such a transfer.
In order to assist State courts in determining what constitutes good cause to *943 deny a request to transfer a custody dispute to a tribal court under section 1911(b), the Bureau of Indian Affairs has promulgated nonbinding guidelines. (Guidelines for State Courts: Indian Child Custody Proceedings, 44 Fed.Reg. 67,584 (1979) (hereinafter, Guidelines).) Among the several possible "good cause" reasons for refusing to transfer an Indian child custody case to the tribal court is that the evidence could not be presented in tribal court without undue hardship to the parties or witnesses. (Guidelines, 44 Fed.Reg. at 67,591.) Although the guidelines are not binding, the courts have recognized that section 1911(b) of the ICWA (25 U.S.C. § 1911(b) (1988)) authorizes use of a modified version of forum non conveniens when deciding whether to retain or transfer jurisdiction in Indian child custody proceedings. See In re C.W. (1992), 239 Neb. 817, 825-26, 479 N.W.2d 105, 113; In re Maricopa County Juvenile Action No. JS-8287 (App.1991), 171 Ariz. 104,107,110, 828 P.2d 1245,1248,1251; Chester County Department of Social Services v. Coleman (1990), 303 S.C. 226, 229-32, 399 S.E.2d 773, 775-76.
We can take judicial notice of the fact that Poplar, Montana, where the Fort Peck tribal court is located, is more than 1,100 miles from the Chicago metropolitan area where S.S. and R.S. reside. Traveling this distance for the termination/adoption hearing would be unduly burdensome on the children, their custodians, the adoption petitioners, and all the other potential witnesses involved with the children's lives, all of whom, apart from Iron Bear, reside in Illinois. Because the bulk of the evidence and the majority of the witnesses necessary to the termination of parental rights action are located in Illinois, a transfer would assuredly constitute an undue hardship. Accordingly, under section 1911(b) of the ICWA, good cause would exist to allow the circuit court of Kane County to retain jurisdiction over the Tubridys' custody petition. See In re Maricopa County Juvenile Action, 171 Ariz. 104, 828 P.2d 1245 (good cause existed to deny transfer from Arizona to out-of-state tribal court); In re J.R.H. (Iowa 1984), 358 N.W.2d 311 (because of geographical obstacles, transfer from Iowa to tribal court in South Dakota would cause undue hardship to parties and witnesses and constituted good cause not to transfer); Chester County Department of Social Services, 303 S.C. 226, 399 S.E.2d 773 (where most of the witnesses and evidence were in South Carolina, good cause existed to deny transfer to tribal court in South Dakota).
For the foregoing reasons, the judgment of the appellate court is reversed, and the cause is remanded to the circuit court for a hearing on whether Iron Bear abandoned R.S. and S.S. If the court finds that there was no abandonment, it shall enter an order transferring this cause to the Fort Peck tribal court. If it determines by clear and convincing evidence that abandonment did occur, it shall reinstate its prior orders denying transfer to the tribal court and retain jurisdiction over the Tubridys' cause of action.
Reversed and remanded with directions.
Justice HEIPLE, concurring in the judgment:
Insofar as neither Justice Harrison nor the dissenters in this case will apply the existing Indian family exception to the Indian Child Welfare Act (ICWA), I concur in the judgment of this court as set forth by Justice Harrison: to wit, that the appellate court should be reversed and this matter remanded to the circuit court for an abandonment hearing to determine where the children are domiciled and thus whether the Illinois courts can retain jurisdiction over this custody dispute pursuant to the ICWA. I write separately, however, to express my view that this court should recognize that the ICWA does not apply where there is no existing Indian family.
Where, as with S.S. and R.S., there is no existing Indian family and the children have never been part of an Indian cultural setting or lived on a reservation, there is no justification for applying the ICWA. It is this rationale that constitutes the existing Indian family exception and Illinois should join the majority of jurisdictions that have adopted the exception and refused to apply the ICWA where children are not part of an existing Indian family. (See In re Adoption of Baby Boy L. (1982), 231 Kan. 199, 643 P.2d 168; S.A. v. E.J.P. (Ala.Civ.App.1990), 571 So.2d *944 1187; In re Termination of Parental Rights of D.S. (Ind.1991), 577 N.E.2d 572; In re Adoption of Infant Boy Crews (1992), 118 Wash.2d 561, 825 P.2d 305; In re S.C. (Okla. 1992), 833 P.2d 1249; In re T.S. (1990), 245 Mont. 242, 801 P.2d 77; In re C.E.H. (Mo. App.1992), 837 S.W.2d 947; In re C.W. (1992), 239 Neb. 817, 479 N.W.2d 105.) Applying the exception in Illinois would limit the ICWA's scope to the issue Congress sought to remedy: namely, the attempts of third parties to remove Indian children from existing Indian families or reservations. 25 U.S.C. § 1902 (1988).
The underlying history and purpose of the ICWA evidence that Congress intended the Act to apply only where third parties seek to remove Indian children from their existing Indian families or cultural settings. Congress enacted the ICWA in recognition of the invasive nature of some State agencies vis-a-vis the custody of Indian children on Indian reservations. The intent underlying the ICWA is apparent in the Act's statement of purpose, which reads as follows:
"to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture * * *." (Emphasis added.) (25 U.S.C. § 1902 (1988).) Indeed, the underlying thread that runs throughout the Act is the prevention of the removal of Indian children from an existing Indian family unit and the resultant breakup of the Indian family. (See 25 U.S.C. §§ 1901(4), (5) (1988); see also In re Adoption of Baby Boy L. (1982), 231 Kan. 199, 206, 643 P.2d 168, 168.) Stated otherwise, the ICWA attempts to ensure that, "where possible, an Indian child should remain in the Indian community." H.R.Rep. 95-1386, 95th Cong., 2d Sess. 23 (1978).
In refusing to apply the existing Indian family exception, the dissent argues that the Supreme Court's decision in Holyfield precludes adoption of the exception. (Mississippi Band of Choctaw Indians v. Holyfield (1989), 490 U.S. 30, 109 S.Ct. 1597, 104 L.Ed.2d 29.) The Holyfield Court, however, never refers to the existing Indian family exception. The sole issue before the Court concerned the domicile of the twin children at issue. Indeed, the Supreme Court has never granted certiorari in any of the numerous cases where our sister State courts have employed the exception, including several cases decided after the Supreme Court's 1988 decision in Holyfield. See In re Termination of Parental Rights of D.S. (Ind.1991), 577 N.E.2d 572; In re Adoption of Infant Boy Crews (1992), 118 Wash.2d 561, 825 P.2d 305; In re S.C. (Okla.1992), 833 P.2d 1249; In re T.S. (1990), 245 Mont. 242, 801 P.2d 77; In re C.E.H. (Mo.App.1992), 837 S.W.2d 947; In re C.W. (1992), 239 Neb. 817, 479 N.W.2d 105.
Moreover, the facts of Holyfield are wholly inapposite to those of the instant case. Holyfield concerned unmarried American Indian parents, both of whom resided and were domiciled on the reservation. (Holyfield, 490 U.S. at 37-39, 109 S.Ct. at 1602-03, 104 L.Ed.2d at 39-40.) Immediately prior to their twins' births, the parents drove off the reservation to a hospital 200 miles away and, upon the children's delivery, placed them with an adoptive family. They then drove back to their reservation. Two months later, the tribe sought to have the adoption invalidated because the tribe had not received the requisite notice under the ICWA and the State court had not, as is mandated by the ICWA, made any effort to place the children with members of their extended family or with another American Indian family. The trial court ruled against the tribe and the Mississippi Supreme Court affirmed, ruling that the children had never been domiciled on the reservation and thus that Mississippi properly exercised jurisdiction over the adoption.
The Supreme Court in Holyfield reversed the Mississippi Supreme Court, holding that the ICWA could not be defeated by "individual reservation-domiciled tribal members" intentionally leaving the reservation in order that their children could be placed in an adoptive home off the reservation. (Holyfield, 490 U.S. at 53, 109 S.Ct. at 1610, 104 *945 L.Ed.2d at 49.) Rather, the Court held that the tribe had exclusive jurisdiction under the Act because the domicile of minors follows that of their parents and the parents at issue clearly never intended to be domiciled anywhere other than on the reservation.
In refusing to recognize the existing Indian family exception, the dissent contends that the reasoning of Holyfield suggests that the exception violates the ICWA. Specifically, the dissent opines that Holyfield stands for the proposition that the ICWA grants the tribes an interest in children separate from that of the children's parents and thus that the existing Indian family exception is improper because it ignores the tribe's interest. This, however, overstates the case.
Under the ICWA, the tribe has exclusive jurisdiction over custody disputes involving Indian children residing or domiciled on the reservation, and where neither of the parents objects. (25 U.S.C. § 1911(a) (1988).) Moreover, the ICWA requires that an effort be made to place these children with a member of their extended family or with another American Indian family. (25 U.S.C. § 1915 (1988).) This, however, is the extent of the tribe's interest. The interest of the tribe is thus not ignored under the existing Indian family exception because, as in the instant case, the exception would only be applied where the children are not part of an existing Indian family. (For post-Holyfield cases employing the exception, see In re Termination of Parental Rights of D.S. (Ind.1991), 577 N.E.2d 572; In re Adoption of Infant Boy Crews (1992), 118 Wash.2d 561, 825 P.2d 305; In re S.C. (Okla.1992), 833 P.2d 1249; In re T.S. (1990), 245 Mont. 242, 801 P.2d 77; In re C.E.H. (Mo.App.1992), 837 S.W.2d 947.) Indeed, it is significant that S.S. and R.S. have never resided on the reservation with their mother, except for one summer visit. Rather, they have been raised and domiciled in Illinois for virtually their whole lives.
The dissent's contention that the exception contravenes the intent of Congress in passing the ICWA also ignores Congress' refusal to abolish the existing Indian family exception. A 1987 amendment to the ICWA presented to the Senate by the Committee for Indian Affairs would have made application of the ICWA mandatory regardless of whether the child had "previously lived in Indian Country, in an Indian cultural environment or with an Indian parent." (See S.1976, 100 Cong., 1st Rec. S18532, S18533 (daily ed. Dec. 19, 1987).) The amendment never made it to the floor of the Senate and has not been presented since. Congress is well aware of the existing Indian family exception and apparently has chosen not to change the statutory language of the ICWA to preclude application of the exception.
I note finally the dissent's intimation that in favoring an abandonment hearing or the adoption of the existing Indian family exception prejudice against or distrust of the Fort Peck tribal court is evidenced. This is not the case and beside the point. S.S. and R.S., at least one-half Caucasian, have lived their whole lives in Illinois divorced from their Indian heritage as a result of their mother's lack of involvement and arguable abandonment. Illinois has a complex set of statutes designed to ensure the best interests of its citizens, including children in situations such as S.S. and R.S. This court is familiar with and regularly called upon to interpret these statutes which are rooted in the common law and have withstood the test of time. My desire to apply Illinois law if possible stems from my confidence in these laws, all of which aim to achieve what is in the best interest of S.S. and R.S.

CONCLUSION
I would hold that the ICWA does not apply in the instant case because S.S. and R.S. are not part of an existing Indian family. Jurisdiction over the custody dispute would thus remain with the Illinois courts and there would be no need for an abandonment hearing to determine where the children are domiciled. Nevertheless, insofar as a majority of this court refuses to acknowledge the existing Indian family exception, I concur in the judgment set forth by Justice Harrison that the appellate court should be reversed and this matter remanded to the circuit court to determine where the children are domiciled and thus whether the Illinois courts can retain *946 jurisdiction over this custody hearing pursuant to the ICWA.
Chief Justice BILANDIC and Justice MILLER join in this concurrence.
Justice McMORROW, dissenting:
"[Lack of knowledge] is one of the greatest barriers to understanding between different peoples. If we do not understand each other, if we do not know the culture and history of each other, it is difficult to see the value and dignity of each other's societies. This is especially true in relations between Indians and non-Indians." Chief Justice Robert Yazzie, Navajo Nation Supreme Court, as quoted in Comment, Tribal Jurisdiction Under Section 1911(b) of the Indian Child Welfare Act of [1978]: Are the States Respecting Indian Sovereignty?, 23 N.M.L.Rev. 479, 496 (1993).
In the late 1970s, Congress recognized that profound ignorance and misunderstanding of Native American Indian cultural values were prompting State social welfare agencies to engage in the wholesale removal of Indian children from their families and the placement of those children in non-Indian homes. Such removals worked a great hardship on the Native American Indian children, their families, and their tribes. Congress enacted the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq. (1988)), in an effort to prevent the placement of Indian children into non-Indian families, by restoring and preserving Native American Indian tribal court jurisdiction over custody proceedings involving Indian children.
In the present appeal, the majority misapprehends the central focus of the ICWA and ignores Congress' plenary powers to give superior authority to a tribal court to assert jurisdiction over custody cases involving Native American Indian children. The unfortunate effect of the majority's opinion is to revert to and perpetuate the regressive State policies and practices that led Congress to enact the ICWA.
The majority opinion misstates the issues presented in this appeal. This court was asked to decide whether it should adopt the "existing Indian family doctrine," which limits application of the ICWA to Indian children who are members of an "existing Indian family." The second issue involves the domicile of two Indian children upon the death of one parent. The majority acknowledges that under the ICWA and traditional principles of common law, the children in the instant cause would take the domicile of their mother, who is their surviving parent. Nevertheless, without the benefit of briefing and argument, the majority sua sponte raises the question of whether the ICWA can be superseded by State domicile law when a nonparent seeking custody alleges that the surviving parent has "abandoned" the children.
Because I believe that these questions should be answered in the negative, I respectfully dissent. The majority is remiss for its failure to address, consider, or resolve the primary issue raised by the parties and ruled upon by the appellate court, i.e., the validity and scope of the existing Indian family doctrine. In addition, the majority's remand of the cause for an "abandonment" hearing in order to determine the children's domicile strongly suggests that the circuit court should retain jurisdiction over the parties' adoption dispute, in contradiction to the plain terms of the ICWA.

Background
The parties in this case are the petitioners, Leslie Scarlotte Tubridy and her husband, Patrick Tubridy (Tubridys), respondent Betty Jo Iron Bear (Betty Jo), respondents Fort Peck Assiniboine and Sioux tribes (Fort Peck tribe or tribe) and Betty Jo's two children, S.S. and R.S.
Although parts of the majority's recitation of the facts are accurate, the majority improperly supplements the record with matters that are unproven. In so doing, the majority attempts to justify its decision by indulging in unsubstantiated attacks upon the character and morality of Betty Jo, the children's surviving Indian parent. For example, the record does not disclose the cause of Richard's death. Nevertheless, the majority states that he died "of a disease he contracted from" Betty Jo (167 Ill.2d at 252, 212 Ill.Dec. at 593, 657 N.E.2d at 938). The briefs to this cause contain arguments from the parties alleging that Richard suffered *947 from acquired immune deficiency syndrome (AIDS), an illness from which Betty Jo also apparently suffers. However, there is nothing in the record to verify the claim that Richard died from AIDS, or that he contracted the illness from Betty Jo. There is no justifiable reason for the majority to make any reference to the nature or cause of Richard's death. Moreover, the majority fails to explain the relevance of this alleged information with respect to the true issue in this cause, which is the tribe's jurisdiction under the ICWA.
The majority is without support in its statement that the children have "visited the Fort Peck reservation only once" and that "neither child has had any significant interaction with an Indian tribe beyond their one visit to the reservation." (167 Ill.2d at 252-53, 212 Ill.Dec. at 593, 657 N.E.2d at 938.) The record does not establish how many times the children have visited the Fort Peck reservation. It is also significant, but undisclosed by the majority, that Betty Jo allegedly has had continuing contact with the children, thereby maintaining the children's contact with their tribal heritage. Her claim that she has had repeated phone conversations with the children, and corresponded with them, stands unrefuted by the Tubridys.
The majority's ruling also reflects a more fundamental error: a failure to appreciate that the ICWA is founded on recognizing and preserving the distinctive character of Indian cultural heritage, such as that of Betty Jo and the Fort Peck tribe. Unfortunately, the majority has devised a strategy, albeit legally unsupportable, to circumvent the requirements of the ICWA.
The Indian Child Welfare Act of 1978
Congress enacted the Indian Child Welfare Act in 1978 in response to extensive evidence indicating that large numbers of Indian children were being removed from their Indian families and their tribes and were being placed in non-Indian homes through State foster care placement, termination of parental rights and adoption proceedings. (Mississippi Band of Choctaw Indians v. Holyfield (1989), 490 U.S. 30, 32,109 S.Ct. 1597,1600, 104 L.Ed.2d 29, 36.) It was revealed that such displacements were prompted by a profound misunderstanding of Indian child-rearing methods as well as a more generalized indifference or antipathy to Indian cultural values and beliefs. For example, State social workers often believed that Indian parents had abandoned their children, when in reality the parents were merely following the Indian custom of collective child-rearing by several members of the child's extended family. The State social workers' failure to acknowledge and appreciate this Indian custom played a role in many instances where children were separated from their Indian families. Only a small percentage of Indian children were placed in foster or adoptive care because of parental abuse; the great majority were removed from their Indian families based on allegations of parental neglect and abandonment. H.R.Rep. 95-1386, 95th Cong., 2d Sess. 10 (1978) (hereinafter House Report).
In fact, information submitted at the congressional hearings "disclosed what almost amount[ed] to a callous raid on Indian children" and indicated that the children were "removed from their parents and families by State agencies for the most specious of reasons in proceedings foreign to the Indian parents." (124 Cong.Rec. 12532 (1978) (remarks of Rep. Udall).) It was also revealed that Indian children were placed for adoption and foster care at an alarmingly higher rate than were non-Indian children. (S.Rep. No. 95-597, 95th Cong., 1st Sess. 11 (1977) (hereinafter Senate Report); House Report at 9.) According to a sponsor of the ICWA,
"Studies * * * revealed that about 25 percent of all Indian children [were] removed from their homes and placed in some foster care or adoptive home or institution. * * * The most distressing and critical factor giving rise to this emerging crisis of Indian families [was] * * * the inability or unwillingness of State agencies or officials to understand the different cultural and social norms prevailing in the Indian world. The record shows that, in all too many cases, Indian parents ha[d] their children forcibly taken from them not because they [were] unfit parents or because they [could not] adequately provide for their children as measured by the norms *948 prevailing in the Indian community, but because they are Indians." 124 Cong.Rec. 38102 (October 14, 1978) (remarks of Rep. Udall).
See also Myers, Gardner & Geary, Adoption of Native American Children and the Indian Child Welfare Act, 18 S.Ct.J. 17 (1994).
It was perceived that part of the reason for such widespread removal of Indian children from their families was to accomplish a "forced acculturation of Native American children into Euro-American society"; the ICWA was adopted in order to end such practices "by recognizing a predominantly tribal jurisdiction over tribal child welfare cases." (Carriere, Representing the Native American: Culture, Jurisdiction, and the Indian Child Welfare Act, 79 Iowa L.Rev. 585, 589 (1994) (hereinafter Representing the Native American).) It was further recognized that the widespread practice of placing Indian children in non-Indian families caused serious harm to the Indian children, their parents and their tribes. As explained by Chief Calvin Isaac, a representative of the National Tribal Chairmen's Association who testified before Congress, "`[c]ulturally, the chances of Indian survival [and the transmission of tribal heritage] are significantly reduced [when Indian children are raised] * * * in non-Indian homes and denied exposure to the ways of their People.'" He further testified that the practice of removing Indian children from the custody of their natural parents by nontribal authorities "`seriously undercut[s] the tribes' ability to continue as self-governing communities.'" He opined that "`[p]robably in no area is it more important that tribal sovereignty be respected than in an area as socially and culturally determinative as family relationships.'" Holyfield, 490 U.S. at 34, 109 S.Ct. at 1600-01, 104 L.Ed.2d at 37 (quoting from the transcripts of the hearings before the Senate Select Committee on Indian Affairs, 95th Cong., 2nd Sess. 193 (1978)).
Although the majority acknowledges that the ICWA was adopted to remedy these problems, the majority ignores that these very issues are present in the instant cause. The majority refuses to confront and grapple with the reality that there can be significant and possibly irreparable harm that is inflicted on Indian children, Indian families, and Indian tribes when Indian tribes are wrongfully deprived of their rightful jurisdiction to determine custody disputes involving Indian children.
The majority also acknowledges, but fails to give content to, the statement of findings and policy adopted by Congress when it enacted the ICWA. Congress emphasized at length that the ICWA was consistent with the special duty that the United States has to preserve and protect Indian tribes. (See 25 U.S.C. § 1901 (1988).) In enacting the statute, Congress reiterated that it was intended to greatly reduce State involvement in Indian child custody disputes, inasmuch as Congress had determined that "the States, exercising their recognized jurisdiction over Indian child custody proceedings * * * have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." (25 U.S.C. § 1901(5) (1988).) In order to prevent or reduce State involvement, Congress declared that it was the policy of the ICWA "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." (Emphasis added.) 25 U.S.C. § 1902 (1988).
The majority's decision eviscerates the ICWA's requirement for consistent and uniform minimum Federal standards and replaces it with the peculiar vagaries of Illinois law with respect to whether alleged parental "abandonment" causes a change in a child's domicile. Such was not the spirit or intent of Congress when it enacted the ICWA, and the majority's disposition is a plain violation of the express terms of the Federal statute.
Under section 1911(a) of the ICWA, the tribal court possesses exclusive jurisdiction "over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of such tribe." (25 U.S.C. § 1911(a) (1988).) In the case of Indian *949 children not domiciled or residing within the reservation of the child's tribe, section 1911(b) creates concurrent but presumptively tribal jurisdiction and requires State courts to transfer jurisdiction over the proceedings to the tribal court, except in cases of "good cause." 25 U.S.C. § 1911(b) (1988).
Whether a child is "domiciled" on a reservation for purposes of a court's jurisdiction under the ICWA was considered at length by the United States Supreme Court in Mississippi Band of Choctaw Indians v. Holyfield (1989), 490 U.S. 30, 109 S.Ct. 1597, 104 L.Ed.2d 29. In Holyfield, Native American Indian parents who were domiciled on an Indian reservation in Mississippi travelled approximately 200 miles off the reservation for the birth of their twins. They executed consent-to-adoption forms immediately after the births and then returned to the reservation. The State courts of Mississippi validated the adoptions over the objections of the parents' Indian tribe, which sought to intervene in the adoption proceeding. However, the United States Supreme Court held that the tribal court had exclusive jurisdiction over the custody proceeding, since the parents had been domiciled on the reservation and the children took the domicile of their parents upon their birth. The Court held that in determining domicile, courts must look to uniform, Federal jurisprudence with respect to this term, and that courts cannot apply an inconsistent interpretation of domicile that might vary from State to State.
The majority acknowledges the general principles regarding domicile of a minor whose parent has died, leaving a surviving parent. As noted by the majority, under established common law, upon the death of Richard, the domicile of the children became that of Betty Jo, the surviving parent and legal custodian. (People ex rel. Noonan v. Wingate (1941), 376 Ill. 244, 249, 33 N.E.2d 467 (at common law upon the death of the father an infant took the domicile of its mother); 25 Am.Jur.2d Domicile §§ 67, 70 (1966) (§ 67: upon the death of the parent to whom custody of a child has been awarded, the domicile of the child becomes that of the surviving parent; § 70: upon the death of the father, the domicile of the minor becomes the domicile of the mother); Restatement (Second) of Conflict of Laws § 22, Comment b, at 63 (1981) (upon the death of the parent who has been awarded legal custody of the child or with whom the child has been living, the child's domicile shifts to that of the other parent even though the latter is domiciled in another State).) Applying these principles to the instant case, the domicile of R.S. and S.S. is the same as that of their mother, i.e., the Fort Peck reservation. Consequently, since this case is a child custody proceeding involving Indian children whose domicile is an Indian reservation, the express language of section 1911(a) of the ICWA mandates that the tribe have exclusive jurisdiction over this action.
The majority believes that the children's domicile should not follow that of their mother, Betty Jo, because there are allegations that she has "abandoned" the children. However, under the terms of the ICWA and its jurisprudential interpretations by the United States Supreme Court, State laws pertaining to abandonment cannot be applied to determine a child's domicile under the Indian Child Welfare Act.
The Supreme Court held in Holyfield that a parent's actions cannot alter tribal court power to assert jurisdiction over a custody proceeding involving an Indian child who is a member of, or is eligible for membership in, the Indian tribe. (Holyfield, 490 U.S. at 51-53, 109 S.Ct. at 1609-11, 104 L.Ed.2d at 48-49.) As a result, the Court held that parental actions amounting to abandonment do not and cannot divest a tribal court of jurisdiction. In so ruling, the Holyfield Court agreed with the reasoning of the Supreme Court of Utah in In re Adoption of Halloway (Utah 1986), 732 P.2d 962, 969-70, that even a finding of parental abandonment cannot be determinative of jurisdiction under the ICWA. (Holyfield, 490 U.S. at 51 n.26, 52-53, 109 S.Ct. at 1609 n. 26, 1610, 104 L.Ed.2d at 48 n. 26, 49.) The Court noted that the decision in Halloway was a "scholarly and sensitive opinion in what has become a leading case on the ICWA." (Holyfield, 490 U.S. at 52, 109 S.Ct. at 1610, 104 L.Ed.2d at 49.) Quoting Halloway, the Court further stated:

*950 "`[State] abandonment law cannot be used to frustrate the federal legislative judgment expressed in the ICWA that the interests of the tribe in custodial decisions made with respect to Indian children are as entitled to respect as the interests of the parents.'" Holyfield, 490 U.S. at 53, 109 S.Ct. at 1610, 104 L.Ed.2d at 49, quoting Halloway, 732 P.2d at 970.
In Halloway, the court ruled that the domicile of the child born out of wedlock was that of his mother on the reservation and that under section 1911(a) of the ICWA the tribe therefore had exclusive jurisdiction over the adoption proceeding. The Halloway court refused to apply State law to defeat the tribe's jurisdiction on the basis that the child had been, arguably, abandoned by the mother after the child's removal from the reservation and placement in a non-Indian home. The court stated, "There certainly is nothing in the ICWA or its legislative history to suggest that state law controls if, in application, its subtleties bring it into conflict with the ICWA in ways that Congress apparently did not foresee. Under general supremacy principles, state law cannot be permitted to operate `as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' [Citation.] If it does, state law is preempted. [Citation.]" Halloway, 732 P.2d at 967.
Based upon Holyfield's endorsement of this reasoning in Halloway, it is readily apparent that Illinois' State-abandonment rules cannot be used to deprive the Fort Peck tribal court of jurisdiction over this custody dispute, which involves two Indian children who are legally presumed to be domiciled on the tribal reservation. Yet this is precisely what the majority accomplishes in its opinion today.
In order to justify its position, the majority attempts to distinguish Holyfield. However, its reasoning does not withstand scrutiny. The majority suggests that Holyfield stands only for the rule that "the doctrine of abandonment cannot be used by Native American Indian parents as part of a scheme to facilitate adoption of their children by non-Indians while they remain domiciliaries of the reservation." (167 Ill.2d at 261-62, 212 Ill.Dec. at 597, 657 N.E.2d at 942.) However, the Supreme Court in Holyfield condemned the State court's use of its own State-law abandonment principles in order to deprive the Indian tribe of its legitimate exercise of jurisdiction over the adoption dispute. Such efforts by a State-court system to use its own abandonment rules in order to oust the tribal court of jurisdiction are just as apparent in the instant cause as they were in Holyfield.
Application of abandonment principles in order to shift the children's domicile from their mother, Betty Jo, is directly contrary to and entirely inconsistent with congressional intent in enacting the Indian Child Welfare Act. As the Supreme Court observed in Holyfield, Congress intended the term "domicile" to have a uniform Federal meaning in order to curtail State authority over child custody proceedings involving Indian children, because it was perceived that, in the past, "the States and their courts [were] partly responsible for the problem [the ICWA] intended to correct." (Holyfield, 490 U.S. at 45, 109 S.Ct. at 1606, 104 L.Ed.2d at 44.) Another congressional concern was the substantial number of instances where social workers misunderstood Indian child-rearing methods as "abandonment," when in actuality the Indian parent's actions were simply a reflection of extended family child-rearing practices. (See Holyfield, 490 U.S. at 34-36, 109 S.Ct. at 1601, 104 L.Ed.2d at 37-38.) Permitting State courts to decide whether an Indian parent has abandoned her children, in order to determine whether the children are domiciled in the State for the purpose of ascertaining tribal court or State-court jurisdiction over the child custody proceeding, could lead to a recurrence of the very abuses which the ICWA was designed to prevent. Given these considerations, I do not believe that Congress intended a State court to decide whether an Indian parent's so-called "abandonment" of her children should deprive the children from taking her domicile upon the death of their father.
Moreover, allowing the State court to decide whether Betty Jo has abandoned her children, in order to determine whether the Fort Peck tribe has exclusive jurisdiction over the Tubridys' adoption petition, creates *951 an anomaly in procedure that is nowhere provided for in the ICWA. Whether Betty Jo has abandoned the children is an issue that properly arises in the context of the Tubridys' allegations that Betty Jo is not a fit parent. However, the majority essentially holds that Betty Jo's alleged abandonment of the children may be considered twiceonce in the context of a domicile hearing, and a second time in the context of a fitness hearing.
Under the ICWA, an allegation of parental unfitness must be proven beyond a reasonable doubt. (25 U.S.C. § 1912(f) (1988).) However, in a traditional unfitness hearing under Illinois law, the proper standard is proof by clear and convincing evidence. (750 ILCS 50/1(D) (West 1992); see, e.g., In re Adoption of Syck (1990), 138 Ill.2d 255, 149 Ill.Dec. 710, 562 N.E.2d 174.) Thus it is unclear which burdens of proof would apply in the instant proceedings. The majority does not explain to the circuit court whether the standard of clear and convincing evidence should apply for the "domicile/abandonment hearing" and whether the standard of proof beyond a reasonable doubt would apply for the "adoption/abandonment hearing." The majority has created an unwarranted, cumbersome, and illogical procedural course. There is nothing in the ICWA that demonstrates congressional intent to allow abandonment to be litigated on two separate occasions during the course of the proceeding, or to allow two different burdens of proof to apply to these proceedings.
In my view, Congress intended the concept of "domicile" to be a "well-defined operating system for effectuating tribal jurisdiction" even in instances where the Indian children lived a substantial distance from the tribal reservation and in all likelihood could not have either close, on-going physical contacts with their tribal relatives, or consistent, in depth exposure to and education about their tribal heritage. (1976 Report on Federal, State, and Tribal Jurisdiction, reprinted in Senate Report at 51-52.) This congressional intent to ensure that domicile would be given a wide and uniform interpretation leads to the conclusion that Betty Jo's children share her domicile upon the death of their father, and that principles of State law regarding "abandonment" cannot be utilized to shift the children's domicile away from that of their biological mother.
In fact, the legislative history of the ICWA reveals that Congress rejected an earlier version of the statute that would have required, as a prerequisite to tribal-court jurisdiction, that an Indian child not living on the tribal reservation have "significant contacts" with the tribe. A review of the original version of the ICWA, initially introduced as Senate Bill 1214, included a provision stating the following:
"In the case of any Indian child who is not a resident of an Indian reservation or who is otherwise under the jurisdiction of a state, if said Indian child has significant contacts with an Indian tribe, no child placement shall be valid or given any legal force and effect, * * * unless the Indian tribe with which such child has significant contacts has been accorded thirty days prior written notice of a right to intervene as an interested party in the child placement proceedings. In the event that the intervening tribe maintains a tribal court which has jurisdiction over child welfare matters, jurisdiction shall be transferred to such tribe upon its request unless good cause for refusal is affirmatively shown." (Senate Bill 1214, § 102(c), quoted in Senate Report at 4.)
The bill further provided:
"For the purposes of this Act, whether or not a nonreservation resident Indian child has significant contacts with an Indian tribe shall be an issue of fact to be determined by the court on the basis of such considerations as: Membership in a tribe, family ties within the tribe, prior residency on the reservation for appreciable periods of time, reservation domicile, the statements of the child demonstrating a strong sense of self-identity as an Indian, or any other elements which reflect a continuing tribal relationship." Senate Bill 1214, § 102(f), quoted in Senate Report at 5.
These provisions that required an Indian child to have "significant contacts" with the tribe were deleted in subsequent legislative action. No reference to "significant Indian *952 contacts" appears in versions of the ICWA that were proposed after Senate Bill 1214, and no reference is made to it in subsequent hearings before the House of Representatives. Rather, Congress considered a version that defines "Indian child" in the same manner as the definition currently given under the ICWA (25 U.S.C. § 1903(4) (1988)), and contains no requirement of "significant contacts" with a tribe anywhere in subsequent legislation.
In light of this legislative history, it would appear that Congress considered, and rejected, a doctrine that would have required the Indian child to have "significant contacts" with his or her member tribe in order to invoke tribal jurisdiction under the ICWA. I believe congressional rejection of the "significant contacts" test is an important indicator that Congress did not intend the ICWA to be limited by a doctrine that would require that an Indian child, in order to take the domicile of his surviving parent, must have had "significant contacts" with the surviving parent and the tribe. Yet this is remarkably similar to the conclusion of the majority in the present cause. The majority suggests that the children's domicile will follow that of their mother, in order to determine jurisdiction, only if the children have had significant contacts with their mother and their tribe. However, according to the majority, Betty Jo has only had "sporadic" involvement in the children's lives and the children have had virtually no contact with the Fort Peck tribe. Construing this lack of significant contacts as evidence of parental abandonment, the majority attempts to bolster the circuit court's jurisdiction over the parties' adoption dispute. The effort is fruitless, however; Congress never intended parental abandonment, or lack of significant contacts, to operate as a means by which to determine State-court jurisdiction over a custody battle involving Native American Indian children.
The majority further tilts the scale in favor of State-court jurisdiction by holding that there is "good cause" under section 1911(b) to retain the adoption proceeding in this State, assuming the tribal court has concurrent jurisdiction over the adoption dispute. The majority's ruling in this regard is particularly inappropriate and disturbing, since the parties have never had the opportunity to argue whether there is good cause to retain the matter in State court. The majority determines that the circuit court should retain jurisdiction under principles of "good cause," notwithstanding the complete and total failure and absence of any hearing, argument, evidence or finding with respect to the issue of good cause. However, the question of "good cause" to retain jurisdiction in Illinois does not even arise until the issue of the children's domicile has been resolved. Because this preliminary question of domicile has not yet been resolved, I disagree with the majority's premature determination that there is "good cause" for the Illinois circuit court to retain jurisdiction over the parties' adoption dispute.
I also depart from the majority's decision because of its refusal to consider the primary argument raised by the parties: the validity and scope of the existing Indian family doctrine. The majority's refusal to consider this question is particularly remiss because it has been extensively briefed before this court and was the primary issue resolved by the appellate court.
I believe the existing Indian family doctrine should be rejected by this court. The doctrine is actually a judicially created prerequisite to the applicability of the ICWA. It is premised upon the notion that application of the ICWA is limited to proceedings seeking the removal of an Indian child from a recognizable existing Indian family unit, home or culture. Proponents of the doctrine rely on the ICWA's references to the removal of Indian children from their families and the breakup of Indian families as support for their position that the underlying purposes and goals of the ICWA are not served or advanced when there is no existing family to maintain or from which an Indian child is being removed. Opponents argue that the doctrine is directly contrary to the express language, purposes and goals of the ICWA, which include protecting Indian tribes as well as Indian families. See generally Davis, The Existing Indian Family Exception to the Indian Child Welfare Act, 69 N.D.L.Rev. 465 (1993).
*953 I suggest that the better approach is to reject the existing Indian family doctrine. There is no provision in the ICWA requiring that an Indian child be born into or be living in an Indian family unit to be subject to its provisions. However much one might believe the ICWA should have been written that way, "[n]o amount of probing into what Congress `intended' can alter what Congress said." (Emphasis omitted.) (In re N.S., (S.D.1991), 474 N.W.2d 96, 100 n. * (Sabers, J., specially concurring).) Congress explicitly granted Indian tribes exclusive jurisdiction over child custody proceedings involving Indian children who are domiciliaries of a reservation and granted tribes presumptive jurisdiction in situations where the Indian children are not so domiciled. 25 U.S.C. § 1911 (1988); accord Holyfield, 490 U.S. at 36, 109 S.Ct. at 1601-02, 104 L.Ed.2d at 38-39; Tellinghuisen, The Indian Child Welfare Act of 1978: A Practical Guide with (Limited) Commentary, 34 S.D.L.Rev. 660, 671 (1989).
I also reject the doctrine because of its potential for abuse in those instances where a State court mistrusts the Indian tribal court's ability to properly consider the "best interests" of the child in determining the child's custody arrangement. As one commentator has noted,
"The notion that Native American tribal courts are more likely than state courts to neglect or inflict suffering on Native American children is grounded in suspicion, not in objective evidence. [With regard to the twin children whose adoption was at issue in Holyfield ], the tribal court confirmed the placement of [the] * * * twins with a nontribal family [as did the tribal court which decided the adoption petition with respect to the Indian child in In re Adoption of Halloway (Utah 1986), 732 P.2d 962]. Moreover, the assumption that tragic outcomes will more likely occur when jurisdiction lies with tribal courts rather than with state courts bespeaks a blindness both to the values and to the level of efficiency attained by the Euro-American child welfare system." Carriere, Representing the Native American, 79 Iowa L.Rev. at 629.
In conclusion, I strongly emphasize that I neither decide nor suggest where the placement of the children should ultimately be. The only question we have been called upon to resolve is the limited legal one of jurisdiction, viz., which tribunal is the proper forum to determine whether the Tubridys should be permitted to adopt Betty Jo's children. Having established its right to exclusive jurisdiction to rule on the Tubridys' adoption petition, "we [should] defer to the experience, wisdom and compassion of the [Fort Peck] tribal court" to make an appropriate decision regarding the children's futures. (Holyfield, 490 U.S. at 54,109 S.Ct. at 1611,104 L.Ed.2d at 50, quoting Halloway, 732 P.2d at 972.) I am confident that the tribal court would accord these proceedings the very serious consideration they deserve and would act with the utmost concern for the children's best interests.
For the reasons stated, I would affirm the judgment of the appellate court.
Justices FREEMAN and NICKELS join in this dissent.